**FLORIDA ROCK INDUSTRIES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 266–82–L.

United States Court of Federal Claims.

Aug. 31, 1999.

---

John A. Devault, III, with C. Warren Tripp, Jr., and Jane A. Lester, all of Jacksonville, Florida, for plaintiff.

Fred R. Disheroon, Special Litigation Counsel, with Lois J. Schiffer, Assistant Attorney General, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C. and William Baxter, United States Army Corps of Engineers, Jacksonville, Florida, for defendant.

### *OPINION*

SMITH, Chief Judge.

This case is before the court on remand from the Court of Appeals for the Federal Circuit. The court is to determine what use, if any, remained after the United States Army Corps of Engineers (Army Corps or Corps), pursuant to the Clean Water Act, denied plaintiff's application for a permit to mine limestone. The court must then determine if the permit denial requires just compensation under the Fifth Amendment to the Constitution.

If all economically viable use of plaintiff's property was destroyed, then a total taking of plaintiff's property occurred, and compensation is due. If the court finds that some economically viable use remains, it must ap-

ply a three-factor test to determine whether a compensable partial regulatory taking occurred. A partial regulatory taking requires that the government pay for the property rights taken, but not for the rights remaining in plaintiff's possession. The court must consider the economic impact of the regulation, plaintiff's reasonable investment-backed expectations, and the character of the government action to make its determination. Compensation is due when this test indicates that plaintiff was singled out to bear a burden which ought to be paid for by society as a whole.

The court finds that the permit denial resulted in a severe, but not total, loss of the economically viable use of plaintiff's property. The court also finds that plaintiff's reasonable investment-backed expectations were frustrated. Finally, the court finds that the government action was a legitimate exercise of governmental power designed to enhance the public stock of wetlands. The court does not inquire into whether the government action was justified. Under the Tucker Act it is enough that the officials had statutory authority and acted within the scope of their duties for there to be jurisdiction and a valid taking claim. In some circumstances, such as acts of war, emergency measures, or the abatement of a nuisance, the character of the government action might prevent a taking from being found. That is not the case here.

After analyzing economic impact, reasonable investment-backed expectations, and the character of the governmental action, the court finds that the Army Corps has engaged in a compensable partial regulatory taking of plaintiff's property under the Fifth Amendment. Florida Rock is entitled to just compensation for the taking of its common law right to mine the underlying limestone on its land. The court hereby awards plaintiff $752,444 plus interest from the date of taking and attorney fees under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970(URA), 42 U.S.C. § 4654(c).

## INTRODUCTION

The text of the Takings Clause appears simple enough: "nor shall private property be taken for public use without just compensation". U.S. Const. amend. V. Defining its key terms, however, has proved a difficult goal. In 1922 Justice Holmes wrote, "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized some values are enjoyed under an implied limitation and must yield to the police power." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922). But this pragmatic concern must also take into account the protection of property enshrined in the Fifth Amendment: "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id.* at 415, 43 S.Ct. 158; *but see Hage v. United States*, 35 Fed.Cl. 147, 150–152 (1996) (judicial role in takings claims is not that of "super legislator or executive, intent on preventing regulation that 'goes too far' ").

More recent cases in the various courts have begun to define what the less-than-objective "goes too far" means in terms of economic impact, compensable property interests, and types of government action. These cases have used the traditional common law tools of analogous reasoning, statutory construction, and precedent to sort out protected property interests. While this process has sometimes been called balancing, it is more analogous to building a stable structure. It is using evidence, like an architect uses beams and timbers to support a floor, a wall, or a roof. It is the creation of a logical framework based upon well-established rules and principles. It is not an act of judicial will, but an exercise of judicial reasoning. While the landscape of taking law might seem littered with partial theories and broken concepts, a stable framework is beginning to crystalize.

The notion that the government can take two thirds of your property and not compensate you but must compensate you if it takes 100% has a ring of irrationality, if not unfairness, about it. If the law said that those injured by tortious conduct could only have their estates compensated if they were killed,

but not themselves if they could still breathe, no matter how seriously injured, we would certainly think it odd, if not barbaric. Yet in takings trials, we have the government trying to prove that the patient has a few breaths left, while the plaintiffs seek to prove, often at great expense, that the patient is dead. This all-or-nothing approach seems to ignore the point of the Takings Clause.

As the Supreme Court explained in *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960), the Takings Clause is triggered by regulation which forces "some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." The present case puts the *Armstrong* principle to the test and goes to the heart of Justice Holmes' formulation of regulatory takings.

Florida Rock has suffered a severe, but only partial, destruction of its property value when its parcel is viewed as a whole. It suffered a deprivation of all of its traditional common law right to its subsurface estate, as well as all economically viable use of the surface of its property. Its reasonable investment-backed expectations have been severely frustrated. Nevertheless, Florida Rock still has property rights in the encumbered parcel, albeit far fewer than it originally possessed.

Thus, the question before the court is whether Florida Rock may be singled out to bear a public burden merely because the regulation of its property does not take its fee simple. The answer, based on the facts of this particular case, is no. The balancing test announced in *Penn Central v. City of New York*, 438 U.S. 104, 124–128, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), weighing the economic impact, reasonable investment-backed expectations, and character of the government action to determine whether compensation is mandated, shows that valuable property rights have been taken from Florida Rock.

While the outcome of the *Penn Central* test is determined by the facts of each case, it is not an entirely *ad hoc* inquiry. Certain legal principles and rules apply to the significance of the various facts. The government, in this case, has acted to achieve legitimate and important goals.[1] Our role, however, is not to make policy choices about the best ratio of regulation to individual rights, but to answer the question whether the public must pay for its regulations in this case. If those regulations take property the Constitution gives a simple answer: yes it must. The Founders chose to provide for just compensation,[2] and this court must determine whether the Takings Clause is triggered by the facts before us today.

Considering the facts of this case and applying the law to them, it is clear that part of Florida Rock's property was taken. Inasmuch as property is taken at all, there must be compensation. This principle can be traced to William Blackstone, who noted: "So great moreover is the regard for private property, that it will not authorize the least violation of it; no, not even for the general good of the whole community." W. Blackstone, 1 Commentaries 135 (1765). To deny compensation in this case would create a doctrine under which property could not, by its very nature, be divided. Such a law of property is foreign to the state of Florida, and, for that matter, to the English common law tradition. As the Supreme Court noted in *United States v. General Motors Corp.*, 323 U.S. 373, 377–78, 65 S.Ct. 357, 89 L.Ed. 311 (1945), the word "property" in the Takings Clause "may have been employed in a more accurate sense to denote the group of rights inhering in the citizen's relation to the particular thing, as the right to possess, use and dispose of it." To hold that property cannot be partially taken by a regulation, on these facts, would be to hold that the need for government regulation trumps the Takings Clause. Yet, the need for government regulation is why the Takings Clause was enacted as a vital protection. Any other

---

**1.** *See Loveladies Harbor v. United States*, 28 F.3d 1171, 1175 (Fed.Cir.1994).

**2.** *See* The Federalist, No. 54, at 339 (J. Madison) (C. Rossiter ed. 1961) ("Government is instituted no less for protection of the property than of the persons of individuals.")

reading would make that clause a virtual nullity. Rather, in a free society, property rights and regulation must exist together. Their ends are not inconsistent. In fact, the Takings Clause implies that property may be taken but that property owners must be compensated.

## BACKGROUND

The facts involved in this case have been concisely set forth in the appellate decision. *Florida Rock Indus., Inc. v. United States,* 18 F.3d 1560 (Fed.Cir.1994), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995)(*Florida Rock IV*). Previous decisions also recount the factual issues of the case. *Florida Rock Indus., Inc. v. United States,* 8 Cl.Ct. 160 (1985)(*Florida Rock I*), *rev'd and remanded, Florida Rock Indus., Inc. v. United States,* 791 F.2d 893 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987)(*Florida Rock II*), *on remand, Florida Rock Indus., Inc. v. United States,* 21 Cl.Ct. 161 (1990)(*Florida Rock III*). Key relevant facts are repeated here for convenience.

In September 1972, plaintiff, Florida Rock Industries, Inc. (Florida Rock), purchased a 1,560 acre parcel located west of Miami in Dade County, Florida known as the Andrus site. The purchase price of the property was $2,964,000 ($1,900 per acre), and the tract was largely composed of wetlands. Plaintiff, a corporation engaged primarily in large-scale limestone mining, purchased the tract specifically for the subsurface limestone, for extraction and conversion into aggregates used in the construction industry. Plaintiff began preliminary mining operations between 1972 and 1974 but, because of a slump in the construction industry, temporarily delayed mining the property until 1978. Plaintiff had complied with state and local permit requirements to mine limestone. *See Florida Rock II,* 791 F.2d at 897; *Florida Rock I,* 8 Cl.Ct. at 164.

After plaintiff purchased the tract, Congress passed, and the President signed into law, the Clean Water Act Amendments of 1972 (the Clean Water Act or CWA).[3] Under section 404 of the Act, the Corps was given the authority to issue permits to discharge dredge or fill material into waters under their jurisdiction. *See* 33 U.S.C. § 1344. The Corps asserted a gradually expanding jurisdiction until, with phase three of the program on July 1, 1977, section 404 permits were required to dredge or fill in all waters of the United States, including wetlands such as Florida Rock's which were not adjacent to navigable waters or their primary tributaries. 33 C.F.R. §§ 323.2(a)(5), 323.3(a)(4), 323.4–4 (1978). In 1978, plaintiff proceeded with mining the parcel. Plaintiff performed additional road construction, constructed a dragline tower, and completed the initial "key cut." In September 1978, the Corps issued a cease and desist order directing Florida Rock to halt immediately any further activity on the site because it believed a section 404 permit to be necessary. Plaintiff complied with the order.

Plaintiff began negotiating with the Corps for a permit to mine the parcel, initially applying for a permit under section 404 to mine the entire 1,560 acres. Because the Corps indicated it would only consider applications covering mining needs sufficient to satisfy a three-year period, plaintiff submitted an application for 98 acres—the amount sufficient to fulfill its three-year needs. The Corps denied this application on October 2, 1980.

Plaintiff's property, like that surrounding it, is considered "wetlands" in that it is regularly inundated with surface or ground water so as to constitute a swamp, marsh, bog, or similar area. *See* 40 C.F.R. § 230.3(t). Wetlands are included as "waters of the United States" and therefore subject to the Clean Water Act. The Corps classifies rock, sand, and other fill materials as pollutants and prohibits their discharge onto wetlands. *See* 40 C.F.R. §§ 230.3(o), 230.10(c), 230.11(c)(3). Under such constraints, the remaining uses for Florida Rock's land are severely limited. Residential or commercial development are precluded by the need to deposit fill upon the wetlands sufficient to support a structure and a road or pathway to reach it.

---

3. P.L. 92–500, Oct. 18, 1972, 86 Stat. 816.

After denial of the permit, plaintiff filed suit in the Claims Court seeking just compensation for a regulatory taking under the Fifth Amendment. Then Chief Judge Kozinski bifurcated the suit and held separate trials on liability and damages. In the first trial, determining liability, the court found the permit denial on October 2, 1980 to be a compensable regulatory taking. *See Florida Rock I*, 8 Cl.Ct. at 165. After a subsequent trial on damages, the court, in a verbal ruling, set the damages at $1,029,000 ($10,500 per acre) for the regulatory taking of the 98 acres at issue.[4]

On appeal, the Federal Circuit affirmed the trial court's refusal to determine that land was taken in excess of the 98–acre parcel, vacated in part, and remanded the case to the Claims Court for further proceedings. *Florida Rock II*, 791 F.2d at 905–06. The Federal Circuit found error in the court's focus on "immediate use" and its exclusion of evidence of a potential investment market for the property in determining post-permit denial value. The court noted that the proper focus should instead have been on determination of a "solid and adequate fair market value (for the 98 acres)." *Id.* at 903.

Florida Rock, interpreting the appellate court's instructions on remand to require that a post-permit denial of fair market value be established using only investors knowledgeable of the regulatory restrictions, presented evidence to show that no market existed among such knowledgeable investors. *See Florida Rock III*, 21 Cl.Ct. at 172. The

court concluded that only a nominal residual value of $500 per acre remained after permit denial, the value which the property would have to a government entity. *Id.* at 175. Finding the evidence provided by Florida Rock was persuasive, the Claims Court decided in *Florida Rock III* that a taking of 98 acres had occurred and again awarded $1,029,000 ($10,500 per acre), plus interest from the date of taking, October 2, 1980. *Id.* at 176.

The court of appeals, remanding in *Florida Rock IV*, 18 F.3d at 1566, 1567, found uncontroverted evidence of an "active though speculative investment market for Florida Rock's land." The Federal Circuit indicated that long-term speculative investment was a viable economic use of Florida Rock's land which the trial court must consider along with other uses such as immediate mining and development. The court remanded for a determination of "what economic use as measured by market value, if any, remained after the permit denial, and for consideration of whether, in light of the properly assessed value of the land, Florida Rock has a valid takings claim." *Id.* at 1564.

## DISCUSSION

■ In 1922, the Supreme Court expressly recognized that regulation that "goes too far" in interfering with the rights of property owners can work a taking.[5] *Pennsylvania Coal Co.*, 260 U.S. at 415, 43 S.Ct. 158. After *Pennsylvania Coal* little elaboration on the concept of regulatory takings occurred until,

---

4. References herein to *Florida Rock I* include the oral ruling on valuation which can be found in the transcript of proceedings on May 7, 1985 at pages 2518–2553. Citations to the record of prior proceedings in this case appear in this opinion in the following form: "Tr. 1-___" refers to the transcript and page for the United States Claims Court trial on liability before then Chief Judge Kozinski, January 3–10 and June 12, 1984. "Tr. 2-___" refers to the valuation trial also in the Claims Court, April 22–May 7, 1985. "Tr. 3-___" refers to the United States Court of Federal Claims trial on remand before Chief Judge Smith, October 24–28, 1988. "Tr. 4-___" refers to the evidentiary hearing before Chief Judge Smith, April 15–18, 1996.

5. Compensation for the indirect or regulatory destruction of property rights was not a new idea

in 1922, however. State courts required just compensation for such takings from the early days of the republic. *See* Kris Kobach, *The Origins of Regulatory Takings: Setting the Record Straight*, 1996 Utah L. Rev. 1211 (providing history of early state decisions compensating indirect or regulatory takings). Most famously, in 1816, Chancellor Kent held that government diversion of a stream constituted a compensable taking of water rights although there was no physical invasion of the land itself. *See Gardner v. Village of Newburgh*, 2 Johns.Ch. 162 (N.Y. 1816). Also, in 1870 the Supreme Court compensated a regulatory taking claim based on the taking of property rights. *See Yates v. Milwaukee*, 77 U.S. (10 Wall.) 497, 19 L.Ed. 984 (1870) (City of Milwaukee must compensate property owner for removal of his wharf pursuant to state legislation).

in *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124–26, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Court announced an ad hoc inquiry, taking into account three factors when deciding whether a regulation has caused a taking:

1) the regulation's economic impact on the claimant;

2) the regulation's interference with distinct investment-backed expectations; and,

3) the character of the government action.

These legal concepts work to ensure that the Takings Clause operates "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. at 49, 80 S.Ct. 1563.

◼ In *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), the Court established that a regulatory taking is effected where a zoning law "denies an owner economically viable use of his land." Recently, the Court held that the deprivation of all economically beneficial or productive use of property constitutes a categorical taking regardless of the importance of the governmental interest being served. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

In contrast to the *ad hoc* inquiry which applies to the regulation of land when all economic value is not destroyed, the permanent physical invasion of real property is always a categorical taking. *See id.* In *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), the Court compensated a minute but permanent partial taking of real estate where New York required a landlord to permit installation of cable facilities on her roof. *See also Hendler v. United States,* 952 F.2d 1364, 1376 (Fed.Cir.1991) (periodic physical intrusion by EPA on plaintiff's property to install and inspect groundwater monitoring wells).

"The fact that the source of any particular taking is a regulation rather than a physical entry should make no difference—the nature of legal interests defining the property af-

fected remains unchanged." *Florida Rock IV,* 18 F.3d at 1572; *see also San Diego Gas & Electric Co. v. San Diego,* 450 U.S. 621, 652, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting) ("Police power regulations such as zoning ordinances and other land-use restrictions can destroy the use and enjoyment of property in order to promote the public good just as effectively as formal condemnation or physical invasion of property."). Accordingly, a regulation which is sufficiently similar to a permanent physical taking of property should require just compensation. When there is a complete destruction of property value it is easy to see that the property owner is in the same position she would be in if the government had permanently occupied the land. But when is a partial diminution in value not merely a diminution, but equivalent to a permanent physical occupation of the land?

## I. COMPENSABLE PROPERTY INTEREST

◼ The initial step in our takings inquiry is to determine whether plaintiff has a compensable property interest. "If plaintiff establishes ownership of its property rights under state law, the second step of the process would then go to liability, or whether government action has actually taken those rights." *Store Safe Redlands Assocs. v. United States,* 35 Fed.Cl. 726, 730 (1996). In this case, it is not disputed that plaintiff owns the 98 acres at issue. The government contends, however, that Florida Rock never had a right to mine limestone on its property, and therefore cannot be compensated for the loss of this use.

Plaintiff responds that the law of the case has already resolved this issue. The court is inclined to agree. This court held that all necessary state and local permits to mine limestone on Florida Rock's property were granted at the time of application to the Army Corps of Engineers. The court found that, "at the time, had an application been made for the full 1,560 acres and considered on the merits, that [Florida Rock] did have all of the permits necessary from Dade County." Tr. 1–39, June 12, 1984 Hearing. The court confirmed this ruling in its later opin-

ion, concluding, "[a]t the time the Corps issued its cease and desist order, plaintiff had all the necessary state permits or waivers...." *Florida Rock I*, 8 Cl.Ct. at 164. This finding as to state and local permits was not disturbed by the Federal Circuit on appeal. *Florida Rock II*, 791 F.2d at 897. The court hereby reaffirms its earlier ruling.[6]

Moreover, there were no federal laws like the Clean Water Act in place at the time of plaintiff's purchase of the land. The evidence is clear that plaintiff could have mined limestone on its property but for the Corps' permit denial. It is also the law of the case that mining of limestone on Florida Rock's property did not constitute a nuisance. The Federal Circuit noted that Florida Rock's use of the property "does no harm", *Florida Rock II*, 791 F.2d at 904, and this court held that "even if the Federal Circuit's statements were not binding on this court, the court on its own is not persuaded that plaintiff's proposed activities would have constituted a nuisance so as to deny plaintiff its rights to just compensation." *Florida Rock III*, 21 Cl.Ct. at 166.

The government argues, however, that Florida Rock's rights must be reconsidered in light of the Supreme Court decision in *Lucas*, a holding which came after the court's findings in *Florida Rock III*. The court addresses the government's arguments below.

**A. Nuisance.**

The government argues that there is no right to compensation because, "[o]n the rec-

ord developed herein, the United States has clearly established that Florida Rock's proposed property use would have been injurious to the public health and safety, as defined by Congress." Def. Post-trial Br. at 71. The government appears to hold the view that Congress' definitions of public health and safety, and a valid finding that these definitions were met, are sufficient to preclude a compensable property interest in land use which conflicts with these definitions. It follows that since this court must "take as given that the revisions in the regulations of the Army Corps of Engineers, and the entire body of federal navigational and environmental laws to which they give effect, advance legitimate and important federal interests," *Deltona v. United States*, 228 Ct.Cl. 476, 657 F.2d 1184, 1192, a legitimate permit denial would therefore preclude a taking. *See* Def. Post-trial Br. at 71–73.[7]

This argument would make sense if legitimate use of the government's regulatory power precluded any takings liability. *See Forest Properties, Inc. v. United States*, 39 Fed.Cl. 56, 69 (1997) (discussing evolution of "nuisance exception" to takings liability). "[H]owever, the Supreme Court narrowed the concept of uses that may be considered injurious to the community to a much more limited concept of uses that would be prohibited by background principles of the state's law of property and nuisance." *Id.*

Nuisance law for purposes of the Takings Clause is not simply defined by Congress,

---

6. The government places particular weight, however, on its assertion that Florida Rock needed a local Class IV sheet flow permit at the time of its Army Corps permit application, and did not apply for one. This argument was dispelled by then Chief Judge Kozinski's well-reasoned ruling from the bench in 1985. *See* Tr. 2–2352 to 2360.

7. The court responds below to defendant's arguments as they relate to the "nuisance exception" to the Takings Clause. Defendant also relied on the theory that Florida Rock's wetlands fall under the federal government's navigational servitude, thus precluding a compensable interest in limestone mining. The court rejects this theory as ungrounded in the law and contrary to the law of the case. *See Florida Rock I*, 8 Cl.Ct. at 179 ("The fact that plaintiff's proposed mining operation would involve wetlands does not by some peculiar alchemy protect the government from the Fifth Amendment's taking clause.");

*Florida Rock II*, 791 F.2d at 900 ("The Clean Water Act in its present form, of course, goes far beyond the concerns of navigation, and such concerns are not implicated in this case, but in any event, the effect of *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) is that the old 'navigation servitude,' often used to excuse what looked suspiciously like takings, is no longer available for that duty in regulatory taking cases."). As plaintiff argues, the theory that wetlands are subject to a navigational servitude as such, would mean that the government never, as a matter of law, takes land pursuant to the Clean Water Act and thus never owes compensation. This conclusion is contrary to Federal Circuit precedent, and would eviscerate the property rights of landowners. Regulation of land to protect water is still regulation of land.

whenever it declares that a use should not occur. The government's argument would enable Congress to pass laws which eliminate property rights retroactively as if those rights never existed in the first place. Where there is a confiscatory regulation, the *Lucas* Court declared: "Any limitation so severe cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." 505 U.S. at 1029, 112 S.Ct. 2886; *see also Keystone*, 480 U.S. 470, 519, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (Rehnquist, J., dissenting) ("Reliance on state law is necessitated by the fact that '[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' ") (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980)). The government must show a limit on plaintiff's property rights which inhered in the title when it was purchased by its owner. The federal government, "by *ipse dixit*, may not transform private property into public property without compensation." *Beckwith*, 449 U.S. at 164, 101 S.Ct. 446. Congress or regulators cannot simply bypass the Fifth Amendment's just compensation provision by declaring long-settled property rights illegal or not permitted. Nor can the artful recitation of a harm-preventing or benefit conferring justification transform compensable government action into that which is not compensable. *Lucas*, 505 U.S. at 1027, n. 12, 112 S.Ct. 2886.

Where a federal statute was already in place at the time the property was bought, the expectations of the property owner may be different. In *M & J Coal Company v. United States*, 47 F.3d 1148 (1995), the Federal Circuit emphasized that "at the time M & J [the property owner] acquired its mining rights, whatever they were, it knew or should have known that it could not mine in such a way as to endanger public health or safety and that any state authorization it may have received was subordinate to the national standards that were established by [federal statute]." *Id.* at 1154.

In this case, the Clean Water Act was not enacted until after Florida Rock's property was acquired. Similarly, in *Loveladies Harbor*, 28 F.3d at 1183, the Federal Circuit explained, "It is important to note that Loveladies purchased the property with the intent to develop it long before these particular state and federal regulatory programs came into effect." In *Loveladies*, unlike *M & J*, it was relevant that the state had granted a permit to develop the property. *See id.* ("[N]othing in the state's conduct reflected a considered determination that certain defined activities would violate the state's understanding of its nuisance powers."). As in *Loveladies*, the court finds it relevant here that plaintiff had secured all necessary state and local permits or waivers to use the land for limestone mining. *See Florida Rock I*, 8 Cl.Ct. at 164; *Florida Rock II*, 791 F.2d at 897.

It remains then to determine whether Florida law understood this type of property use to be a nuisance at the time of the taking. *See Lucas*, 505 U.S. at 1029, 112 S.Ct. 2886. The Supreme Court of Florida has stated that

> An owner or occupant of property must use it in a way that will not be a nuisance to other owners and occupants in the same community. Anything which annoys or disturbs one in the free use, possession, or enjoyment of his property, or which renders its ordinary use or occupation physically uncomfortable, is a "nuisance" and may be restrained.

*Mercer v. Keynton*, 121 Fla. 87, 163 So. 411 (1935) (quoted in *Knowles v. Central Allapattae Properties, Inc.*, 145 Fla. 123, 198 So. 819 (1940); *City of Miami v. City of Coral Gables*, 233 So.2d 7 (Fla.Dist.Ct.App.1970)). Florida also has a public nuisance statute which stated in relevant part:

> Whoever shall erect, establish, continue, or maintain, own or lease any . . . place which tends to annoy the community or injure the health of the community . . . or any place where any law of the state is violated, shall be deemed guilty of maintaining a

nuisance and the ... place ... [is] declared a nuisance.

Fl. Stat. § 823.05 (1979).

Here, the only disturbance or activity injurious to the health of the community alleged by the government is that plaintiff's limestone mining would result in "pollution" of the wetlands as defined by Clean Water Act regulations. The authority of the Army Corps to prevent such pollution by denying plaintiff's section 404 permit is undisputed. Florida state nuisance law, however, does not appear to preclude such "pollution". Nor is plaintiff's proposed activity alleged to violate any other Florida laws. Thus, the court finds that plaintiff's activity was, except for the Corps' denial, permissible under relevant property and nuisance principles. *See Lucas*, 505 U.S. at 1029, 1030, 112 S.Ct. 2886.

The court follows the Federal Circuit's pronouncement in *Florida Rock II* that the Army Corps district engineer's decision established that any pollution of water by Florida Rock for its proposed activity was not very serious. *Florida Rock II*, 791 F.2d at 904; see also *Florida Rock III*, 21 Cl.Ct. at 166 (not a nuisance). As noted in *Florida Rock II*, "[W]hen appellant characterizes the regulatory action as one to prevent pollution, it is really elevating form over substance." 791 F.2d at 904. Moreover, the district engineer's decision declared that " '[w]ater pollution does not appear to be a problem' at (water supply) wells adjacent to similar pits." *Id.* Indeed, "a moderate and pro forma polluter such as Florida Rock does no harm." *Id.*

Nevertheless, the placing of fill upon wetlands technically amounts to "pollution" under the Clean Water Act. Mining or development of plaintiff's land unavoidably requires the placement of fill. Plaintiffs placement of fill on wetlands, however, would be a violation of federal, not state law. In fact, the Florida Department of Transportation told Florida Rock that it was their *recommenda-*

*tion* and that of the Dade County Planning Department that new rock plants be located within the Pennsuco area, where plaintiff's property is located. The Clean Water Act concerns do not show the existence of a nuisance under state law. As the Federal Circuit observed in *Florida Rock II*, "The concern of the district engineer is almost exclusively the continued existence of the wetland, not the temporary and moderate pollution incident to the occurrence of actual mining." 791 F.2d at 904.

As the *Lucas* court noted:

The fact that a particular use has long been engaged in by similarly situated owners ordinarily imports a lack of any common-law prohibition (though changed circumstances or new knowledge may make what was previously permissible no longer so....) *So also does the fact that other landowners, similarly situated, are permitted to continue the use denied to the claimant.*

505 U.S. at 1031, 112 S.Ct. 2886 (emphasis added).

In this case, other landowners in the vicinity have been allowed to operate rock quarries. These other limestone mining operations carry on apparently without official concern about their effect on ground water. Dade County and the City of Miami draw ground water from the Northwest Wellfields which lie to the east of the subject property quite close to these other quarries.[8] Rock quarries were still in operation within the Pennsuco area at least eight years after plaintiff's application to engage in the same activity was denied. *See Florida Rock III*, 21 Cl.Ct. at 166–167.

The court finds that plaintiff's limestone mining operation would, like similar operations in the vicinity, result in only moderate, superficial pollution that does no harm, and would not be considered a nuisance under

---

8. In 1985 the court noted that

the area in the vicinity of plaintiff's property is littered with rock quarries, most of them much closer to the wellfields than plaintiff's property. These quarries have been in existence for many, many years, some predating the wellfields. Yet the local authorities do not hesitate to operate the wellfields, and, indeed, estab-

lished them in that area despite the pervasiveness of rock mining.

*Florida Rock I*, 8 Cl.Ct. at 175; *see also* Larsen Tr. 1–60, 68 (Pennsuco area zone of intensive rock mining); Tolson Tr. 1–293, 311 (Rinker, Sterling, Capeletti continued to mine within eyesight of plaintiff's site); Slack Tr. 4–624 (known as rock mining area).

the relevant Florida laws. Indeed, plaintiff's operation was suitably located in the community and designed to help meet the community's need for aggregates to be used in construction. *See* French, Tr. 1–204 to 206.

In light of these facts, the court finds that plaintiff's proposed mining operation was not a public or private nuisance under Florida law. Florida Rock's use of its property was not a nuisance for purposes of the court's taking inquiry. Accordingly, Florida Rock had a compensable property interest in its right to mine limestone.

## II. WHETHER A TAKING OCCURRED

### A. Categorical Takings

The first instance in which categorical takings have been found, where there is physical invasion of the property, does not apply in this case. *See Lucas*, 505 U.S. at 1015, 112 S.Ct. 2886. The second instance where categorical treatment is appropriate is "where regulation denies all economically beneficial or productive use of land." *Id.* Both parties now agree, pursuant to the Federal Circuit decision in *Florida Rock IV*, that all economically beneficial use of the land was not denied. The court finds, as further explained herein, persuasive evidence of a speculative market for property comparable to Florida Rock's land. Accordingly, the court holds that economically beneficial use of the land remained after permit denial. This is probably the case in most regulatory takings circumstances as people are usually willing to speculate that the future may bring beneficial change to the value of property. There was thus no categorical taking of Florida Rock's land.

### B. Penn Central and Partial Regulatory Takings

On remand, this court is directed to:

reconsider the assessments proffered by the parties and the other evidence in the record, and determine a fair market value accordingly. Should that determination establish, as the evidence in the record suggests, that there was some (but not total) reduction in the overall market value of plaintiff's property as a result of the regulatory imposition, the question will then be posed: does that reduction constitute a taking of property compensable under the Fifth Amendment?

*Florida Rock IV*, 18 F.3d at 1567, 1568. Ultimately, the question before the court is does "a partial deprivation resulting from a regulatory imposition, that is, a situation in which a regulation deprives the owner of a substantial part but not essentially all of the economic use or value of the property, constitute a partial taking, and is it compensable as such?" *Florida Rock IV*, 18 F.3d at 1568. In sum:

By taking some portion of Florida Rock's economic use of the property—its power to disturb the overlying wetlands, and with it the common law property right to mine its subsurface minerals—the Government appears to have destroyed part of the value of Florida Rock's holdings. If that proves to be the case, and if the application of the [*Penn Central*] ad hoc tests previously described so warrant, the property interest taken belongs to the Government, and the right to just compensation for the interest taken belongs to Florida Rock.

*Id.* at 1572.

The *Penn Central* inquiry entails an analysis of the economic impact, effect on reasonable investment-backed expectations, and character of the government action. Using these factors, a partial regulatory taking may be found where a regulation results in a deprivation of "a substantial part but not essentially all of the economic use or value of the property," *Florida Rock IV*, 18 F.3d at 1568; *see also id.* at 1569, 1570 (line drawn between partial regulatory taking and mere diminution). When such a regulation "allocate[es] to some number of individuals, less than all, a burden that should be borne by all," *Florida Rock IV*, 18 F.3d at 1571, there is a taking. In the case of a partial taking the government should not be forced to buy the entire parcel, nor should the property owner be forced to relinquish the entire parcel. *See id.* at 1571–72. Justice requires, and the text of the Takings Clause mandates,

"just" compensation for the property taken, no more and no less.[9]

The *Penn Central* test the court applies today is sensitive to the facts of each case. For example, compensation has previously been required where the rights taken are of singular importance, *see, e.g., Hodel v. Irving*, 481 U.S. 704, 705, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987) (right of tribe members to pass on property to heirs); *Babbitt v. Youpee*, 519 U.S. 234, 243, 117 S.Ct. 727, 136 L.Ed.2d 696 (1997) (same), or the interference with investment-backed expectations is overwhelming, *see Kaiser Aetna*, 444 U.S. at 179, 100 S.Ct. 383 (compensation due where government consented to dredging of private marina, but then destroyed plaintiff's right to exclude others). Compensation has been denied where the economic impact was not proven, *see, e.g., Keystone*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (plaintiffs retained right to mine almost all of their coal). In the end, however, "the question depends upon the particular facts". *Pennsylvania Coal*, 260 U.S. at 413, 43 S.Ct. 158. "There simply is no bright line dividing compensable from noncompensable exercises of the Government's power when a regulatory imposition causes a partial loss to the property owner." *Florida Rock IV*, 18 F.3d at 1570. However, this does not lead to a standardless judicial exercise of will. Rather, the court must analyze the property interests, where and to what degree the alleged diminution caused by the regulation occurred, and the economic effect on the total property. This is the same analytical approach used by the common law over the last millennium to define property rights and decide disputes over them.

## II. The Three Factor Penn Central Test.

### A. Economic Impact

The first *Penn Central* factor the court considers is the economic impact of the gov-

ernment action on plaintiff's property. The Federal Circuit directed that on remand, the Court of Federal Claims must determine the "loss of economic use to the property owner as a result of the regulatory imposition." *Florida Rock IV*, 18 F.3d at 1571. Underlying that determination is a calculation of fair market value as it was outlined in *Florida Rock II*:

> [T]he court should consider, along with other relevant matters, the relationship of the owner's basis or investment, and the fair market value before the alleged taking, to the fair market value after the alleged taking. In determining the severity of the economic impact, the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored.

*Id.* at 1567 (quoting *Florida Rock II*, 791 F.2d at 905). Fair market value is:

> [T]he price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.

*United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973).

A determination of economic impact must focus on a relevant parcel of plaintiff's property. In determining the relevant parcel, the court follows the teachings of *Penn Central*, 438 U.S. at 130–31, 98 S.Ct. 2646, as recently restated in *Concrete Pipe & Prod. v. Const. Laborers Pension Trust*, 508 U.S. 602, 644, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993):

> a claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable. To the extent that any portion of property is taken, that portion is always taken in its

---

9. The Tenth Circuit seems to take a different view of the Federal Circuit's holding in *Florida Rock IV*, which it rejects. *See Clajon Production Corp. v. Petera*, 70 F.3d 1566 (1995). The *Clajon* court disagreed with a plaintiff who had argued for a Lucas analysis where the government takes the entirety of a stick from the bundle of property rights, the right to hunt surplus game. The *Cla-*

*jon* court understood *Florida Rock IV* to suggest that "many variants of property rights should be analyzed separately for a regulatory taking just as is done for a physical taking." *Id.* at 1577. This court understands *Florida Rock IV* to mean that the property must be analyzed as a whole, but compensation may be due for a part of the property.

entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question.

*See also Lucas,* 505 U.S. at 1016 n. 7, 112 S.Ct. 2886 (denominator of "deprivation" fraction); *Loveladies,* 21 Cl.Ct. 153, 160 n. 9 (1990) (citing *Loveladies Harbor Inc. v. United States,* 15 Cl.Ct. 381, 391–393 (1988)) *aff'd* 28 F.3d 1171 (Fed.Cir.1994) (discussing parcel as a whole); *Keystone,* 480 U.S. at 497, 107 S.Ct. 1232 (describing the "denominator" issue).

▮ In *Concrete Pipe,* the Supreme Court rejected plaintiff's contention that its property rights in a pension plan had been taken in their entirety and, therefore, that it had suffered a compensable taking pursuant to a *Lucas* analysis (permanent physical occupation or destruction of all economically beneficial use). The Court in *Concrete Pipe* declined to treat an interest in a pension plan as the entire parcel and instead found no taking where the regulation allegedly resulted in a 46% diminution in shareholder equity overall. "[M]ere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe,* 508 U.S. at 645, 113 S.Ct. 2264. This principle does not preclude the partial takings analysis discussed in *Florida Rock IV,* however. *Concrete Pipe* merely says that partial destruction in the value of the parcel is inadequate to prove a compensable taking occurred.[10] Here, the court must apply all three parts of the *Penn Central* test, recognizing that diminution in value is but one element of the calculation. In the case at bar, the relevant parcel is the 98 acres of land owned by Florida Rock, and not merely their right to mine or develop it.

1. *Diminution in Value*

a. *Value Before Permit Denial.*

The court conducted a separate valuation trial in 1985 after which then Chief Judge Kozinski gave an oral ruling from the bench. He established a pre-denial value of $7,500

per acre for 1,240 acres in two one-section tracts (including the 98 acres at issue) fronting on Krome Avenue and $4,000 per acre for 320 acres (½ section) not fronting on Krome Avenue The 98 acres at issue, pursuant to the government's argument, was considered in light of the value taken from plaintiff's total holdings of 1,560 acres in the three large tracts rather than standing alone. Valuing the 98 acres standing alone would have led to a higher pre-denial price per acre.

Plaintiff's valuation expert, Mr. Sewell, testified that, because in his opinion there were no comparable sales, alternative approaches must be relied on. The court, however, characterized plaintiff's alternatives, the discounted present value and royalty models, as "too uncertain, ... too indefinite, ... and too speculative." Tr. 2–2521 Still, the court considered and adopted the models as indications of a high limit on value. It should be noted, however, that while comparable sales are generally the least speculative method of valuation, the Federal Circuit affirmed the discounted cash flow method in another mining case, *Whitney Benefits, Inc. v. United States,* 926 F.2d 1169 (Fed.Cir.1991).

The court, in its 1985 valuation, relied instead on comparable sales, a more traditional and orthodox method of valuing property. Beginning with the comparable sales covered in the report of Mr. Slack, the government's appraiser, the court took into account the fact that those sales were tainted by bankruptcy proceedings, that permits were not in place for one property, and that some were distress sales, not really arm's length transactions, or otherwise did not properly reflect the market. The court found that these sales took place somewhere near Florida Rock's property and somewhere near in time to when the taking was deemed to have occurred.

The court made upward adjustments from Mr. Slack's comparable sales with respect to plaintiff's property based on access to Krome Avenue and the fact that plaintiff's property

10. Furthermore, *Concrete Pipe* involves the taking of economic rights—rights in a pension plan—not real property interests such as rights to use land or water. *See Stupak–Thrall v. United States,* 89 F.3d 1269, 1295 n. 30 (6th Cir.1996)

(Boggs, J. dissenting) (reading *Concrete Pipe* "to reject the argument that there is a denominator issue involved in non-physical property rights cases").

was further south, and closer to the fastest growth and development. The court found Krome Avenue to be a major artery, a substantial road capable of carrying truck traffic, and that it leads directly south, providing ready access to the fastest growing area of the county. Mr. Slack's comparables were further north and not fronted on the major road. Based on these adjustments, the court established the market value of $7,500 per acre for plaintiff's 1,240 acres fronting on Krome Avenue.

The court then made additional upward adjustments, with respect to the 98 acres at issue, for three factors: frontage on Krome Avenue, presence of a road on the property, and the presence of state and local permits. The 98 acres fronts on Krome Avenue and does not extend all the way back to plaintiff's rear property line, making it relatively more valuable. A road to Krome Avenue had already been constructed on the 98 acre parcel, again making that parcel relatively more valuable than the remainder. The larger parcel, which would only be developed or mined over a longer time, was more at risk for that reason of being later limited in its use by changing local, state, or even federal restrictions. The court found that there was a state waiver and a county permit to mine Florida Rock's entire 1,560 acre property. It noted however that "one never knows how the law will change in the future." Tr. 2–2545. It determined that this uncertainty was less as to the 98 acres. The $7,500 per acre was increased by $1,000 per acre for each of these three factors. Accordingly, the court found that $10,500 per acre, or $1,029,-000, was the amount by which the 1,560 acres would have been diminished by the taking of the 98 acres at issue. Tr. 2–2545–46; *see also* 5/17/85 order on valuation as of 10/2/80. The court also noted that $10,500 per acre was well within the range of what such mineable properties sold for in the area.

In *Florida Rock III* the court let stand the methodology used in determining the pre-permit denial valuation of the property because it was not clearly erroneous under the standards set forth in RUSCC 52(a). *Florida Rock III*, 21 Cl.Ct. at 165 n. 4. RUSCC 52(a) provides in part that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *See also Florida Rock II*, 791 F.2d at 897, 905, 906 (court let stand Judge Kozinski's $10,500 pre-denial valuation); *Florida Rock IV*, 18 F.3d at 1563 (trial court erred in determining after-taking value, not pre-taking value). For the same reasons that its determination of pre-denial value was let stand in prior proceedings, the court now finds that the pre-denial value of the property at issue was $10,500 per acre or $1,029,000.

**b.** *Value After Permit Denial.*

The market for land in the vicinity of the subject property was based upon two ultimate uses—rock mining and development. Of the two, rock mining represented an immediate use because of existing demand for aggregates used in the construction of roads and buildings on the expanding fringe of Miami, several miles away. The demand for land for residential or commercial development had not yet reached as far as plaintiff's property at the time of permit denial. Outside of speculative investment, therefore, mining was the only economically viable use of the property at the time of the taking. *See Florida Rock I*, 8 Cl.Ct. at 166. Anticipation of possible future developmental demand and of continued aggregate demand both contributed to the purchase of land in the area.

The value of real property is in its utility. Even those who purchased land in the vicinity for resale did so based on the perception of present or future utility. Once plaintiff's dredge and fill permit had been denied the property could no longer be used for mining for the foreseeable future. At that point its only remaining value was as a speculative investment vehicle. The remaining value after permit denial was based on the possibility that wetlands regulations would someday be eased so that mining or development could then proceed.

The court views plaintiff's discounted cash flow and royalty models as indicators of high limits on value for the same reasons those valuation methods were so treated in earlier

proceedings. While those methods may be the only suitable indication of value under some circumstances,[11] they are not appropriate for our purposes at this time on this record. Because an active market for real estate existed in the vicinity of the subject property near the time of permit denial, the court finds the market comparison or comparable sales method to be the better indicator of fair market value.

In considering the testimony of the parties' appraisers and other indications of fair market value, the court has accounted, as it did when establishing pre-denial value, for various factors that affect market value. For example, sales of smaller tracts typically occurred at higher prices per acre than larger "wholesale" transactions. Tracts with road frontage tend to be more valuable than those without. Property near the Sweetwater area outside Miami also commanded a premium for its proximity to that rapidly developing fringe. Florida Rock's was the only property in the vicinity to be denied a dredge and fill permit for rock mining by the Army Corps. None of the comparable sales used by the parties' appraisers displayed this feature.

Here, the court adopts the theory espoused by the government in *Florida Rock I* that the most appropriate valuation is reached by valuing the 98 acre parcel at issue in terms of its contribution to the larger 1,560 acre tract. When making its pre-denial determination in *Florida Rock I*, the court established a value per acre for the larger parcel and then made adjustments for features that distinguished the smaller tract from it. The court follows the same procedure now.

The government's valuation expert, Stephen Cantwell, valued the entire 1,560 acres, part of which lacked frontage on Krone Avenue, at $2,451 per acre after permit denial. Adjusting for frontage, Mr. Cantwell assigned a value of approximately $2,600 per acre to the 98 acres at issue as a part of the whole. Mr. Larry Sewell, plaintiff's valuation expert, assigned a value of $2,200 per acre to the entire 1,560 acre tract. Unlike Mr. Cantwell, however, Mr. Sewell did not distinguish between the acreage with frontage and that without. He valued the entire 1,560 acres and prorated the 98 acres. The court, therefore, must make an initial adjustment in Mr. Sewell's $2,200 figure to reflect the fact that 1,240 acres fronts on Krome Avenue and 320 acres does not. The court and Mr. Cantwell allotted an average of 86% of the entire property's value to the 1,240 acres with Krome Avenue frontage. Applying that percentage to Mr. Sewell's $3,432,000 appraisal of the entire 1,560 acres results in a price of $2,380 per acre for the 1,240 acres with frontage, of which the 98 acres is apart.

The court will utilize Mr. Cantwell's $2,600 per acre and Mr. Sewell's $2,380 per acre adjusted figure, which average $2,490 per acre for the 98 acre parcel at issue as a part of the larger 1,560 acres. This is done because both appraisers gave credible evidence and their average is well within both appraisers' error margin. Theodore Slack also testified for the government at the 1996 evidentiary hearing as to the value of plaintiff's 98 acres standing alone, but not as a part of the entire 1,560 acres. His $3,979 per acre figure cannot be fairly compared with the prices per acre from Messrs. Cantwell and Sewell which were based on larger, wholesale transactions. Because Mr. Slack's appraisal was not for the 98 acres as a part of the larger tract, the court has not included his figures in the takings analysis.

The court now turns to the adjustments for features that distinguish the 98 acre subject property from the larger 1,560 acre tract. One upward adjustment made in *Florida Rock I*, is questioned by this court, but in any event, no longer applies. At that time the court raised the value of the subject property to reflect the fact that permits and waivers had been secured from state and local authorities. This upward adjustment for the subject property reflected the uncertainty as to whether those permits would remain in effect for the remainder of the 1,560 acres, land that would not have been mined for at least three years. After permit denial, the relatively greater certainty of hav-

11. *See Whitney Benefits Inc. v. United States,* 18 Cl.Ct. 394, *affirmed,* 926 F.2d 1169 (Fed.Cir.), *cert. denied,* 502 U.S. 952, 112 S.Ct. 406, 116 L.Ed.2d 354 (1991).

ing permits in place for the first three years was really too speculative to be taken into consideration if it was not totally lost. Dredging and filling is now definitely forbidden on the 98 acre parcel. Accordingly, the court makes no upward adjustment for permit certainty.

The next adjustment was for road frontage on Krome Avenue. The premium previously attached to that road frontage is reduced for post-denial valuation, however, by the fact that no immediate use of the property, beyond holding for speculation, is allowed for the foreseeable future. If and when, at some unknown date in the future, wetlands regulations are eased, the owner of the property at that time will undoubtedly find that it is worth more by virtue of its road frontage. A buyer today would pay more for the possibility of realizing that future benefit. The adjustment for road frontage at the pre-taking stage was $1,000, added to the $7,500 base price. The court finds it reasonable to make a lesser adjustment at this time in proportion to the diminished price of the property post-denial. Accordingly, the court adds $332 per acre as an upward adjustment to the 98 acres based on its road frontage which increases the preliminary amount calculated above from $2,490 to $2,822 per acre for the 98 acre parcel at issue.

The last adjustment made by *Florida Rock I* was for the presence of a gravel access road on the property itself. That road is still in place on the property although the premium attached to its existence is largely eliminated in the aftermath of permit denial. If and when wetlands regulations are eased the road may have some utility. However, the road will tend to deteriorate over the years and it is unclear whether the property owner would be allowed to perform road maintenance under the terms of the CWA regulations. It also produces some liability concern. Thus, its value, if any, becomes highly speculative and will not provide a basis for an upward adjustment. Thus, the court finds that the value of plaintiff's 98 acre parcel after permit denial was $2,822 per acre.

Additional evidence of purchase offers and an appraisal done for tax assessment purposes provide strong support for the accuracy of the court's $2,822 per acre post denial valuation. Mr. Baker, Florida Rock's president, rejected post-denial offers averaging $2,869 per acre. *See Florida Rock III,* 21 Cl.Ct. at 170 n. 7. He testified that Florida Rock had intended to mine the property, not sell it, and that the offers were made under "a cloud of uncertainty" while the company was "right in the middle of a court case" involving the very property now at issue. The court does not rely on unaccepted offers to establish fair market value. *See United States v. Smith,* 355 F.2d 807, 811 (5th Cir. 1966) (citing *Sharp v. United States,* 191 U.S. 341, 24 S.Ct. 114, 48 L.Ed. 211 (1903)); *Missouri Baptist Hospital v. United States,* 213 Ct.Cl. 505, 555 F.2d 290, 303 (1977); 4 Nichols, Eminent Domain 12B.04[2] (3d ed.). The court nevertheless finds the evidence of these offers a confirmation of its separate calculation of fair market value based on comparable sales.

In addition, when Florida Rock disputed its property tax assessment in state court following permit denial by the Army Corps, the court affirmed a fair market value based on comparable sales for tax purposes of $2,621 per acre. *See Florida Rock Industries v. Bystrom,* 485 So.2d 442, 447–48 (Fla. Dist.Ct.App.1986). Although this court is not bound by the findings of the Florida state court in *Bystrom,* the court nevertheless finds in those proceedings a further confirmation of its separate calculation of fair market value based on comparable sales. *See Florida Rock IV,* 18 F.3d at 1563 n. 6; *Florida Rock III,* 21 Cl.Ct. at 174.

### c. *Diminution*

As explained above, before the Army Corps of Engineers denied Florida Rock's section 404 permit, plaintiff's land in south Florida was worth $10,500 per acre. After permit denial the same property was worth only $2,822 per acre. For the 98 acres, this amount is a 73.1% diminution in value. The court does not rely on the magnitude of this diminution in value alone, however, to determine the severity of the economic impact to plaintiff resulting from permit denial.

### 2. *Reciprocity of advantage*

The economic impact of certain land use controls, when shared by other members of

the community, has been held to be non-compensable. *Florida Rock IV*, 18 F.3d at 1570 (citing *Agins v. Tiburon*, 447 U.S. 255, 262–63, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980)) (shared "benefits and burdens" of a zoning ordinance); *Penn Central*, 438 U.S. at 131, 98 S.Ct. 2646 (same). "When there is reciprocity of advantage, paradigmatically in a zoning case ... then the claim that the Government has taken private property has little force: the claimant has in a sense been compensated by the public program 'adjusting the benefits and burdens of economic life to promote the common good.' " *Florida Rock IV*, 18 F.3d at 1570 (quoting *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646); *see also Creppel v. United States*, 41 F.3d 627, 631 (Fed.Cir.1994) (quoting *Lucas*, 505 U.S. at 1018, 112 S.Ct. 2886) (" 'Mere diminution' occurs when the property owner has received the benefits of a challenged regulation, such that an 'average reciprocity of advantage' results from it."). Accordingly, when the court assesses economic impact, it must determine whether Florida Rock has been compensated through the regulation itself. *Cf. Belk v. United States*, 12 Cl.Ct. 732, 734 (1987) (American hostages of Iran were principal beneficiaries of Algerian accords by which they were freed although thereby losing their cause of action against Iran).

A "partial taking occurs when a regulation singles out a few property owners to bear burdens, while benefits are spread widely across the community." *Creppel*, 41 F.3d at 631 (citing *Florida Rock IV*, 18 F.3d at 1571). Here, the surrounding community benefits from the wetland's filtering action, stabilizing effect, and provision of habitat for flora and fauna. Florida Rock benefits from being a member of a community which has the potential for a better environment. But there can be no question that Florida Rock has been singled out to bear a much heavier burden than its neighbors, without reciprocal advantages. Limestone mines that are still allowed to operate nearby, to the east of the Dade–Broward Levee, are among those who enjoy Florida Rock's beneficence without sharing its burden.

In Florida Rock II, the Federal Circuit determined that

This appears to be a situation where the balancing of public and private interests reveals a private interest much more deserving of compensation for any loss actually incurred. The private interest, unless relieved by a Tucker Act award, sustains what may well be a permanent obligation to maintain property for public benefit, to carry the taxes and other expenses, and not to receive business income from the property in return.

791 F.2d at 904. Florida Rock has paid, and continues to pay, a much higher price for its benefit than have other members of the community. The court finds that Florida Rock's disproportionately heavy burden was not offset by any reciprocity of advantage.

### 3. *Alternative Permitted Activities.*

Although plaintiff can no longer mine or develop its property, the court must assess the economic impact of that restraint in terms of any other activities that are still permitted under the regulations and which are economically realistic. *See Florida Rock IV*, 18 F.3d at 1568 n. 21, 1571. The one valuable post-regulation use of Florida Rock's land, as evidenced by the court's valuation of the parcel, *supra*, is to sell the property on the speculative market. Florida Rock could also use its land for the observation of wildlife or maybe even for hunting. However, these are not commercially valuable uses. As noted in *Florida Rock II*, defendant's expert witness conceded that a " 'willing buyer' subject to the regulation would have to be, and would be, one who expected to put the property to no immediate use." 791 F.2d at 901. In *Florida Rock III*, the court found "no persuasive evidence that there is a market for the property for purposes of hunting, recreation, or scientific study, other than among government entities which might be interested in acquiring the wetlands at the nominal price of [$500 per acre]." 21 Cl.Ct. at 170, n. 7 and at 171. The subject property, as well as most of the land located between U.S. 27 and the Dade–Broward Levee, has very little near-term development potential.

## 38

### 4. *Recoupment of investment.*

In determining the severity of the economic impact of permit denial, the court must also take into account whether Florida Rock was able to recoup its investment subject to the regulation. *See Florida Rock IV*, 18 F.3d at 1567 (quoting *Florida Rock II*, 791 F.2d at 905). Dr. James Nicholas, an economist, evaluated Florida Rock's economic basis in the property as of October 2, 1980.[12] He concluded that plaintiff's economic basis in the 98 acres at issue was $597,000 as of that date, or $6,000 per acre. He arrived at this figure by combining actual expenditures for purchase price, acquisition interest, and property taxes adjusted for inflation using the consumer price index. He did not include any other provision for a return on investment, nor did he include the cost of other capital expenditures like test borings, the feasibility study, or the cost of preparing the site for mining and restoring the property as required by the Army Corps. Having considered Dr. Nicholas' credible testimony on this point and in light of the post-denial valuation otherwise established, the court finds that plaintiff could have recovered barely half of its inflation adjusted investment in the subject property through the only remaining means, resale as a speculative investment.

### 5. *Severe Economic Impact*

It is clear that Florida Rock suffered a severe economic impact when the Corps denied plaintiff's application for a dredge and fill permit. The value of its 98 acre parcel of land, for which the permit was denied, was diminished by almost three fourths. That diminution in value was not offset by any reciprocity of advantage. Furthermore, plaintiff was unable to recoup its investment in the property by selling it, the only means still available under the regulations.

### B. Interference with Reasonable Investment–Backed Expectations.

■ The second prong of the *Penn Central* test looks to whether or not the regulation of plaintiff's property interfered with plaintiff's "distinct investment-backed expectations." 438 U.S. at 124, 98 S.Ct. 2646. Plaintiff must show that the regulation of its property frustrated reasonable expectations, however, if it is to show a taking. "A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *See Ruckelshaus v. Monsanto*, 467 U.S. 986, 1004–1006, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980)). In this case, plaintiff contends its reasonable investment-backed expectation to mine limestone was frustrated.

### 1. *State and Local Permits.*

The government asserts that state and local regulations prohibited rock mining on the subject property, thus precluding a taking of this right. This claim is not supported by the evidence, and conflicts with the law of the case, as discussed earlier in this opinion. The mere presence of such regulatory programs does not affect our analysis. *See Forest Properties Inc. v. United States*, 39 Fed. Cl. 56, 71 (1997). Accordingly, state and local regulations did not diminish plaintiff's reasonable investment-backed expectations.

The *Penn Central* opinion suggested it is important whether or not the expected use of the property was the primary expectation for the property. *See Penn Central*, 438 U.S. at 136, 98 S.Ct. 2646 ("So the law does not interfere with what must be regarded as *Penn Central's* primary expectation concerning the use of the parcel."); *see also* Mandelker, *Investment–Backed Expectations in Takings Law*, 27 Urb. Law. 215, 217 (1995) (*Penn Central* "implies a landowner can claim his investment-backed expectations are frustrated if a land-use regulation does interfere with his primary expectations concerning his property.").

---

**12.** In *Florida Rock I* the court accepted Dr. Nicholas' testimony as to after-denial value but the court of appeals questioned that testimony. *Florida Rock II*, 791 F.2d at 903. The court of appeals observed that "[t]here may be a question

what knowledgeable buyers would have paid, but that they would have paid some substantial figure seems certain." *Id.* Here the court is relying on separate testimony by Dr. Nicholas as to plaintiff's economic basis, not after-denial value.

Florida Rock bought 1,560 acres in south Florida for limestone mining in 1972, having identified a layer of limestone approximately 50 feet deep underlying the entire property, over 100 million tons of mineable rock. All state and local permits or waivers necessary to mining were in place. Plaintiff's contract to purchase the site at issue here was revocable in the event the limestone reserves proved insufficient in quantity or quality to warrant mining. Florida Rock purchased the property for $2,964,000, and made additional expenditures to prove its reserves including test borings in April 1972. It conducted a feasibility study in 1974 which indicated that Florida Rock could proceed with its mining plan and soon be profitable. In 1974 plaintiff "commenced mining operations on the property at issue, which consisted, *inter alia*, of filling a road into the property, stripping the three to four feet of overburden from the limestone, and wet mining the limestone by dragline." Petition at 6; *see also* Pappas Tr. 1–215–17. All these steps had been completed prior to the extension of the Corps' jurisdiction to Florida Rock's property in 1977. Although extensive mining did not begin until after the regulations were passed, the court finds from the clear evidence that the property had been devoted to mining prior to the regulations.

Florida Rock had evaluated the market for aggregates near Miami, assessed the reliability of that market during the entire useful life of the mine, and made the business decision, as an experienced limestone mining company, to supply that market. It intended to profitably mine and sell limestone aggregates from the subject property for many years as Miami continued to build and expand. Florida Rock was a corporation devoted to mining. It bought the instant property with the primary expectation that it would use its land for mining limestone. Accordingly, the court holds that the "primary expectation concerning the use of the parcel," *Penn Central*, 438 U.S. at 136, 98 S.Ct. 2646, was frustrated.

Furthermore, the *Penn Central* Court emphasized the importance of obtaining a "reasonable return" on the property owner's investment in determining the presence of a taking. *Id.* ("More importantly, on this record, we must regard the New York City law as permitting Penn Central not only to profit from the Terminal but also to obtain a 'reasonable return' on its investment."); *id.* at 149, 98 S.Ct. 2646 (Rehnquist, J., dissenting) ("The Court has frequently held that, even where a destruction of property rights would not otherwise constitute a taking, the inability of the owner to make a reasonable return on his property requires compensation under the Fifth Amendment.") (citing *United States v. Lynah*, 188 U.S. 445, 470, 23 S.Ct. 349, 47 L.Ed. 539 (1903)). As the Court held above, in it discussion of economic impact, plaintiff was not able to recoup its investment due to the regulation of its property. Although there is no right to recoup one's investment, the inability to do so weighs in plaintiff's favor, since the regulation consequently places a greater burden on plaintiff.

An additional fact in our investment-backed expectation analysis relates to how much of the parcel of property, the 98 acres, has been burdened by the regulation. In *Keystone*, the Supreme Court held that a regulation which only impacted 2% of the coal owned by petitioners did not materially affect investment-backed expectations. *See* 480 U.S. at 499, 107 S.Ct. 1232. The Court noted that such a small percentage of the relevant parcel would not support a taking argument. *See id.*, n. 27. Accordingly, this court finds it relevant, though not dispositive, that in this case limestone underlay the entire parcel, and 100% of the primary use of that parcel was affected. This indicates a very large interference with investment-backed expectations.

2. *Plaintiff's Reasonable Investment–Backed Expectations were Frustrated.*

In sum, the court finds that Florida Rock's reasonable investment-backed expectations were frustrated. Florida Rock had no reason when it purchased its property to expect that its rights to mine or develop the land were open to question. The Clean Water Act was passed after Florida Rock already owned the land, and the Army Corps did not

have jurisdiction under the Act over wetlands like those owned by Florida Rock until July 1, 1977. Accordingly, the Clean Water Act could not have put Florida Rock on notice that its property might be taken from it so as to destroy investment-backed expectations. *Compare Andrus v. Allard,* 444 U.S. 51, 66–67, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979) (regulations barring trade in certain goods did not constitute a taking), *with Lucas,* 505 U.S. at 1027–28, 112 S.Ct. 2886 (elimination of all economic use of land requires just compensation); *Creppel,* 41 F.3d at 632 (land bought in reliance on non-existence of CWA); *Forest Properties,* 39 Fed.Cl. at 71 (section 404 permit requirement does not preclude compensable property interest); *Bowles v. United States,* 31 Fed.Cl. 37, 51 (1994) (land acquired with reasonable belief that wetlands regulations did not apply); *Ciampetti v. United States,* 18 Cl.Ct. 548, 557, 558 (1989) (awareness of permit requirement only one factor of investment-backed expectation). Plaintiff had no reason at the time of purchase to believe the use of its property would be limited to speculative investment.

## C. Character of Government Action

### 1. *Regulatory Power*

Turning to the third prong of the *Penn Central* test—the character of the government action—the Federal Circuit instructed that "it is for the trial court as an initial matter to determine whether the Government acted within its proper role in the circumstances presented by the case of *Florida Rock.*" *Florida Rock IV,* 18 F.3d at 1571. Justice Holmes recognized that "some values are enjoyed under an implied limitation and must yield to the police power." *Pennsylvania Coal,* 260 U.S. at 413, 43 S.Ct. 158. The regulation here is not under the police power, as it was in *Pennsylvania Coal,* a state case involving public safety. The power involved here is the federal power over waters of the United States. There is little dispute that the purpose of the regulatory action of permit denial was to enhance the water and ecological system of the United States and south Florida in particular by preserving more wetlands. It was to benefit the public, not prevent Florida Rock from doing any

harm. Rock mining is widespread in this region of Florida. The only difference between this property and various other mining operations, as the court observed on the site view, is that it was west of an arbitrary line the government decided upon as the limit of wetland protection. Unlike the traditional nuisance case where the government prevents what the citizen had no right to do under the common law, here the activity was perfectly permissible until the permit was denied. Florida Rock's activity posed no health or safety risk. The government made a permissible policy choice that this land should benefit the public's supply of wetlands. This court cannot review or scrutinize or second guess this policy choice. Plaintiff does not ask the court to do this anymore than in a condemnation proceeding a court could review or second guess a need for a road or a school. The court must, however, decide whether this action has taken the plaintiff's property as effectively as if it had been condemned.

There is no dispute between the parties as to whether preservation of the wetlands through the Corps' implementation of the Clean Water Act serves to advance legitimate state interests. Florida Rock chose not to challenge the government's permitting power as it could have done with an Administrative Procedure Act suit in district court. Instead, it sought just compensation for a taking under the Fifth Amendment. It, of course, has this right. In fact, the difficulty of an APA challenge probably counseled this course.

## III. TAKING COMPUTATION

■ The court must consider the economic impact, reasonable investment-backed expectations, and character of the government action to determine whether a compensable taking occurred. Here, the court must consider both the severe economic impact on Florida Rock and its frustrated expectations, as well as the government's legitimate exercise of its regulatory power. The court notes that "[w]hat is not at issue is whether the Government can lawfully prevent a property owner from filling or otherwise injuring or destroying vital wetlands. The importance

of preserving the environment, the authority of state and federal governments to protect and serve ecologically significant areas ... through appropriate regulatory mechanisms is not here being questioned." *Loveladies*, 28 F.3d at 1175.

The regulation in this case destroys almost three quarters of the value of the relevant property Even though this is obviously a significant destruction of the value of plaintiff's property, it is not dispositive of the issue. Destruction of the majority of a parcel's value does not always amount to a compensable taking. *See, e.g., Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (no taking despite 75% diminution); *See Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (no taking despite 87½% diminution). However, the Supreme Court has stated time and again that the regulatory taking inquiry is an *ad hoc*, fact specific inquiry. As the Federal Circuit has noted, "we do not read these early precedents as creating an automatic numerical barrier preventing compensation, as a matter of law, in cases involving a smaller percentage diminution in value." *Yancey v. United States*, 915 F.2d 1534, 1541.

In *Yancey*, the Federal Circuit affirmed compensation for a 77% reduction in value of plaintiffs' turkeys due to a USDA quarantine. *Yancey*, 915 F.2d at 1534. The turkeys, which were for breeding, had to be sold for slaughter instead. The court concluded the Yanceys "suffered severe economic impact and had no way of anticipating the interference with their investment backed interest." *Id.* at 1543. Notably, the Yancey's turkeys had been devoted to one use, breeding, and after regulation were only valuable, at a great loss, through sale. This fact pattern is very similar in some respects to the present case, in which the property was devoted to mining. After regulation Florida Rock's land had only one remaining immediate use, sale of the property for much less than its value before regulation. As in *Yancey*, the court finds that the economic impact of the regulation was severe. Florida Rock suffered a very substantial loss in the value of its parcel as a whole, a loss that was not offset by reciprocity of advantage. The only remain-

ing immediate use of any value, sale of the property, would recoup barely half of Florida Rock's inflation adjusted investment. The regulation precludes any "'reasonable return' on its investment," *Penn Central*, 438 U.S. at 136, 98 S.Ct. 2646, while inflicting substantial loss on the parcel's market value.

The frustration of Florida Rock's reasonable investment-backed expectations is beyond doubt. Moreover, the frustration is also absolute. Unlike the *Keystone* case, in which the Supreme Court noted "there is no showing that petitioners' reasonable 'investment backed expectations' have been materially affected," 480 U.S. at 499, 107 S.Ct. 1232, and where "the regulatory program places a burden on the use of only a small fraction of the property that is subjected to regulation," *id.* at n. 27, the entirety of Florida Rock's limestone is unusable. Florida Rock, which relied on the regulatory regime in place to support limestone mining, has been treated to only one immediate use for the property: resale at a loss.

This is not the "extraordinary case in which a particular activity is seen as so offensive to the public sensibility as to warrant no Constitutional protection." *Loveladies*, 28 F.3d at 1183. The question, then, is the following: "has the Government acted in a responsible way, limiting the constraints on property ownership to those necessary to achieve the public purpose, and not allocating to some number of individuals, less than all, a burden that should be borne by all?" *Florida Rock IV*, 18 F.3d at 1571. The government's action was responsible, and does not appear excessive to achieve the public purpose, but it also most certainly allocates to Florida Rock a burden that should be borne by all.

The final prong of the *Penn Central* test, the character of the government action, does not here argue against a taking, but rather for one; to benefit the public. Florida Rock's bundle of property rights was severely diminished: "the government, under the guise of regulation, cannot take from a property owner the core economic value of the property, leaving the owner with a mere shell of shambled expectations." *Hendler v. United States*, 952 F.2d 1364, 1373 (1991). Al-

though it is true that not every strand in the bundle was cut, *see Loretto,* 458 U.S. at 435, 102 S.Ct. 3164 ("the government does not simply take single 'strand' from the 'bundle' of property rights: it chops through the bundle, *taking a slice of every strand"*), the thin handful which remains little resembles the full sheaf once held by Florida Rock. It strains the court's sense of logic to suggest this well-pruned parcel is still whole. Florida Rock's property, post-regulation, is different in kind, not merely degree, from its preregulation property, and this argues for a compensable taking. The government might as well have physically occupied the property, leaving Florida Rock the option of visiting its land for recreation, or selling it.

The court finds that Florida Rock suffered a taking of property as defined by the Fifth Amendment to the Constitution. The Takings Clause was designed to protect individuals and compensate them for very legitimate exercises of government power. The due process clause of the Fifth Amendment protects individuals from illegitimate exercises of such power.

"[B]asic understanding of the Fifth Amendment makes clear that it is designed not to limit governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). The court's holding today does not address policy in a larger sense, but only seeks to answer the question whether Florida Rock's property was taken without just compensation. The Supreme Court explained our duty eloquently in *First English:*

> [O]ur present holding will undoubtedly lessen to some extent the freedom and flexibility of land-use planners. .... But such consequences necessarily flow from any decision upholding a constitutional right; many of the provisions of the Constitution are designed to limit the flexibility and freedom of governmental authorities, and the Just Compensation Clause of the Fifth Amendment is one of them.

482 U.S. at 321, 107 S.Ct. 2378. As that Court did, we are bound to recognize the wisdom expressed by Justice Holmes: "[A] strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal,* 260 U.S. at 416, 43 S.Ct. 158.

The property taken is the right to mine limestone, effectively destroyed by the regulation of Florida Rock's power to disturb its wetlands. In this case, the loss of these rights of use, and the concomitant loss in the parcel's value, comprise the taking.[13] The court notes the dissent's argument in *Florida Rock IV* that "[v]alue is not a transferable interest. Thus, a claim for loss of value does not constitute a takings claim within the meaning of the Fifth Amendment." *Florida Rock IV,* 18 F.3d at 1573 (Nies, J., dissenting). That, however, is not this case. This opinion has not treated lost value as identical

---

**13.** Although what is taken in a partial regulatory taking is both value and property, *see Florida Rock IV,* 18 F.3d at 1572, a specific property interest was nevertheless taken from Florida Rock. In *Eastern Enterprises v. Apfel* 524 U.S. 498, 118 S.Ct. 2131, 2156–57, 141 L.Ed.2d 451 (Kennedy, J., concurring), 118 S.Ct. at 2161 (Breyer, J., dissenting), a majority of the Supreme Court held that a regulation must relate to a specific interest for the Takings Clause to apply. The court does not see any contradiction between the *Florida Rock IV* ruling and *Eastern Enterprises.* The Federal Circuit bases its partial taking inquiry on the existence of a taking of value from the whole parcel, *see Florida Rock IV,* 18 F.3d at 1572 ("the Government appears to have destroyed part of the value of Florida Rock's holdings"), which, pursuant to the *Penn Central* test, may result in compensation for the taking of a specific interest, *see id.* ("if the application of the ad hoc tests previously described so warrant, the property interest taken belongs to the Government, and the right to just compensation for the interest taken belongs to Florida Rock."), in this case the traditional rights to use land for mining. If it is necessary to name the government's interest post taking, the court would suggest the government now owns a negative easement. *See* Frank Michelman *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law,* 80 Harv. L. Rev. 1165, 1187 n. 45 (1967). However, "[t]he courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking." *General Motors,* 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945).

to property rights. This is in accord with the *Florida Rock IV* majority's statement that "[t]he dissent is concerned that what is being taken is 'value,' not property. In fact, in a regulatory context such as this it is both." *Florida Rock IV*, 18 F.3d at 1572. Here, the value lost is indeed the measure of the property taken.

In *Loretto*, a physical taking of a minute portion of a landlord's property was deemed a taking. The Federal Circuit observed with respect to *Loretto* that "the Government was not required to buy the building". *Florida Rock IV*, 18 F.3d at 1572. "The fact that the source of any particular taking is a regulation rather than a physical entry should make no difference—the nature of legal interests defining the property affected remains unchanged." *Id.* at 1572.[14] Regulations often require courts to look at entire parcels to determine their impact, but that does not mean property only exists in the form of the entire parcel. Inasmuch as a taking occurs, it is proper that the court compensate only for those property interests actually taken by regulation. In this case, they are the strands of Florida Rock's bundle of property rights which involve use of the surface and subsurface. The right to sell, which accounts for the remaining property value, is a valuable right and was not taken, and therefore the court may not compensate for that portion of the property, despite the severe harm to plaintiff's parcel.

## CONCLUSION

The Army Corps' denial of plaintiff's application for a dredge and fill permit resulted in a 73.1% diminution in the value of plaintiff's land. This diminution is certainly severe, although not complete. What value remained was based almost entirely on the possibility that wetlands regulations would be relaxed at some point in the future. Plaintiff was left with only the right to hold its land or sell it to another—rights vastly different both in value and in kind from the right to mine limestone and the right to develop its land, both of which plaintiff has lost.

Plaintiff has been made the unwilling custodian of the wetlands on its property for the benefit of the public at large, at plaintiff's own risk and expense. Having analyzed the economic impact of the regulation, plaintiff's reasonable, distinct investment-backed expectations, and the character of the governmental action, the court concludes that the denial of plaintiff's section 404 permit application by the Army Corps of Engineers effected a compensable partial regulatory taking of plaintiff's 98 acre property. The compensation due plaintiff for that taking, as measured by the change in value before and after permit denial, is $752,444. The parties have agreed that the date of any taking was October 2, 1980. Defendant shall pay compound interest from that date.

Pursuant to the court's finding of a partial regulatory taking with respect to the 98 acres, plaintiff is hereby awarded $752,444 plus interest from the date of taking. The entry of judgment will be stayed pending the determination of attorneys' fees and costs to which plaintiff is entitled pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970(URA), 42 U.S.C. § 4654 (1994). Plaintiff is to file any such claim within 60 days from the filing of this opinion. Following the

14. The court notes an important distinction between the instant case and *Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), in which the right to sell property was taken. In that case, petitioner had owned eagle feathers which could no longer be sold pursuant to the Eagle Protection Act. The Supreme Court noted, "the denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Id.* at 65–66, 100 S.Ct. 318. Aside from the fact that Florida Rock has effectively lost two traditional strands, the surface estate and the subsurface estate, it is important to note that this case is one of real property. In *Lucas*, the Court noted that *Andrus* was a "case of personal property", and applied a different test for destruction of economic value to real property. *See Lucas*, 505 U.S. at 1027–28, 112 S.Ct. 2886. And in *Babbitt v. Youpee*, 519 U.S. 234, 117 S.Ct. 727, 136 L.Ed.2d 696 (1997), the Court struck down a regulation of the right to devise real property, even though the regulation did not entirely destroy the right, but limited it severely. *See also Hodel v. Irving*, 481 U.S. 704, 719, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987) (Scalia, J., concurring) ("[I]n finding a taking today our decision effectively limits *Allard* to its facts.")

determination of attorney's fees and costs, the court will then, pursuant to RCFC 54(b), direct the Clerk of the Court to enter judgment.

The court notes that when this case was first tried the court determined that only 98 acres were compensable because the permits were for only three-year-periods and 98 acres comprised the amount of land that could be mined over a three-year-period. A lot of time has lapsed since the 1980 denial. During the period from the permit denial to the present time another five permits would have been applied for, but for the first permit's denial. Since the first denial has never been reconsidered the court can only assume that these permits would also have been denied. *Cf. City National Bank of Miami v. United States,* 30 Fed.Cl. 715, 720 (1994) (futility of applying for other wetlands development permits). This is in addition to the fact that the first permit's denial effectively blocked the planned utilization of the other 1,462 acres. This in some ways would be analogous to the denial of a permit to construct the first floor of a ten story building. The inhibition on the upper nine stories is obvious.

In light of this court's decision it would be manifestly unfair to require the plaintiff to sue again for these subsequent permits, as well as the future permits that will be blocked until the property's limestone reserve would have been exhausted. In view of this concern the parties are asked to recommend further courses of action. One possibility is a settlement premised on the appellate future of this ruling. In other words, "if first permit denial is a taking then the total value is X, and of course if permit denial is not a taking then no value for future denials." A second possibility is a real and full settlement based on a discounting of each side's risk of litigation success. A third option is an appeal of that part of this opinion based on the 98 acres with either a stay of the question of the other acreage or a hearing to determine its value while the 98 acre issue is appealed. These general thoughts are meant to be suggestive rather than definitive. The parties are asked to respond to this issue with short briefs within 60 days at which time the court would decide on a proper procedure for resolving all issues in this case.

**IT IS SO ORDERED.**