**Robert BRACE, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 98–897 L.**

United States Court of Federal Claims.

Dec. 1, 2000.

Henry Ingram, Resource Law Partners, Pittsburgh, PA, for plaintiff.

Susan V. Cook, United States Department of Justice, Washington, D.C., for defendant, with whom were Assistant Attorney General Lois J. Schiffer, Julia K. Evans, and of counsel Pamela Lazos and Janet Williams, U.S. Environmental Agency, Region III.

## ORDER

MOODY R. TIDWELL, III, Senior Judge.

A property owner filed a complaint alleging that the government effectively took his property without just compensation when plaintiff was ordered to cease maintenance and operation of a drainage system on its property and to restore portions of property to a prior condition which would exhibit wetland characteristics. Plaintiff contends that the government action has interfered with his reasonable, investment-backed expectations he had when he acquired the property in 1975, since jurisdiction under the Clean Water Act had not been extended until 1977. Plaintiff also contends that his property has been severely impaired. Now before this court is the defendant's motion for summary judgment. For the reasons set forth below, defendant's motion for summary judgment is *DENIED*.

## BACKGROUND

The following facts are undisputed for the purpose of this motion, unless otherwise noted. In the instant matter, both plaintiff and defendant rely on facts concluded by the United States Court of Appeals for the Third Circuit.[1] Plaintiff claims the taking of approximately 30 acres of property located in Erie County, Pennsylvania, by the federal government without just compensation, in violation of the Fifth Amendment to the Constitution.[2]

Defendant asserts that plaintiff is a farmer who owns approximately 600 acres of real property, by relying on the Third Circuit's summarization of facts as determined by the United States District Court for the Western District of Pennsylvania.[3] Mr. Brace disputes this fact and argues that the references to the 600 acres of land were based on findings by the District Court which involved an action brought against plaintiff and a corporation in which plaintiff had an interest.

In December 1975, plaintiff purchased two parcels of land from his father, one of which contained the wetland site, that is at issue in the instant case. One parcel, the Homestead Farm (hereinafter "parcel A"), consisted of approximately 80 acres, while the second parcel, the Murphy Farm (hereinafter "parcel B" or "Subject Property"), consisted of approximately 60 acres and contained the wetland site. Defendant argues that plaintiff purchased the property with the intent of integrating the property into the larger 600 acre operation. Plaintiff states that he purchased the property with the intention of continuing in the family farming business, improving the two parcels of land, and expanding his farming business.

The U.S. Department of Agriculture, Agricultural Stabilization and Conservation Service ("ASCS"), had previously prepared a drainage plan relating to the wetland site, parcel B, for plaintiff's father after it identified portions of the site containing wetlands. Mr. Brace's father used the land only for pasture, not for growing crops. Mr. Brace was aware of and utilized the soil conservation plans.

In May 1983, plaintiff acquired an additional 135 acres from his cousin. The land is adjacent to parcels A and B.

Plaintiff states that from 1976 to 1987, plaintiff cleared, leveled and drained the wooded and vegetated property, while defendant states that plaintiff did this from 1985 to 1987. Plaintiff paid for excavation in the site and the laying of "drainage tile" in the form of plastic tubing in an effort to drain the property. As a result of plaintiff's leveling, spreading and tiling, plaintiff began to grow crops on the site in 1986 and 1987, although

---

**1.** *See United States v. Brace,* 41 F.3d 117 (3d Cir.1994). The Third Circuit's case involved a government action against plaintiff alleging violations of the requirement of the Clean Water Act that permits must be obtained for discharge of dredge or fill materials into waters of the United States.

**2.** The Fifth Amendment forbids the federal government from taking "private property ... for public use without just compensation." U.S. Const. amend. V.

**3.** *United States v. Brace,* No. 90–229 (W.D.Pa. Dec. 16, 1993). The District Court's Adjudication of Findings of Fact determined that the defendants, Brace and Brace Farms, Inc., a Pennsylvania corporation, owned approximately 600 acres of property located in Erie County, Pennsylvania.

plaintiff states that he began to grow crops on the property in 1976. Plaintiff did not have a Clean Water Act (hereinafter "CWA") section 404 permit authorizing his activities.[4]

The United States became aware of plaintiff's activities in 1987, and between 1987 and 1988, it issued three orders directing plaintiff to refrain from further disturbing the site so that it could naturally revegetate the area with indigenous plant species. Mr. Brace states that the three orders directed plaintiff to refrain from further disturbing over 200 acres, some of which he owned and some of which he did not. The first of these three orders, issued on July 15, 1987, was an Administrative Order issued by the Environmental Protection Agency (EPA). The second order was a Cease and Desist Order, issued on July 23, 1987, by the Army Corps of Engineers (hereinafter "Corps") of the United States of America. The third order was on May 3, 1988, when the EPA issued another Administrative Order (hereinafter collectively "the Orders") after finding that plaintiff was engaged in dredge and fill activities in waters of the United States without a permit required by section 404 of the Clean Water Act. Plaintiff was ordered to cease maintenance and operation of the drainage system on the parcel B, the Subject Property, and to restore portions of the Subject Property to a prior condition exhibiting wetlands characteristics. Despite the issuance of the Orders, Mr. Brace continued to mow vegetation at the site which prevented revegetation of indigenous plants.

During the summer of 1988, plaintiff contacted the ASCS and requested that his property receive the status of "commenced conversion from wetlands" prior to December 23, 1985. The ASCS granted the status based on plaintiff's ongoing farming activity commencing prior to December 1985.[5]

On October 4, 1990, the United States filed an enforcement action against plaintiff in the United States District Court for the Western District of Pennsylvania. On December 22, 1993, the District Court held that plaintiff's activities were exempt from the permit requirements of section 404 of the CWA. On November 22, 1994, on appeal by the United States, the United States Court of Appeals for the Third Circuit reversed the District Court and held plaintiff liable for the violations asserted in the orders issued by the EPA and the Corps, and remanded the matter to the District Court for remedial measures.

On September 3, 1996, the District Court entered a Consent Decree enjoining plaintiff from operating and maintaining the drainage system for parcel B containing the wetland site. The court ordered plaintiff to dismantle the drainage system and restore a portion of the Subject Property consisting of approximately thirty acres to its prior wetlands conditions and made the requirements of the Consent Decree binding upon transferees of the wetland property.

Plaintiff complied with the Consent Decree by eliminating the drainage system and now alleges that, as a result, a substantial portion of the Subject Property is permanently unusable by him for his farming operation and at least thirty acres have been taken for public purposes for public benefit and use, without just compensation.

## DISCUSSION

### I. Standard of Review

The instant matter comes before the court on the defendant's motion for summary judgment. Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judg-

---

4. Section 404 of the Clean Water Act prohibits the "discharge of dredged or fill material into the navigable waters" without obtaining a permit from the Army Corps of Engineers. 33 U.S.C. § 1344.

5. The Third Circuit's opinion explains that the ASCS has authority to make such determinations under the Food Security Act of 1985, 16 U.S.C. §§ 3801, et seq., which contains a provision that

denies certain Department of Agriculture benefits to farmers who produce an "agricultural commodity on converted wetland," unless such conversion commenced prior to December 23, 1985. 16 U.S.C. §§ 3821, 3822 (1988 & Supp. V 1993). The Third Circuit noted that the ASCS stated that "'granting of a commencement...request does not remove other legal requirements that may be required under State or Federal water laws.'" *Brace*, 41 F.3d at 121 (citation omitted).

ment as a matter of law. *See* Rule 56(c) of the Rules of the Court of Federal Claims (RCFC); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of establishing the absence of any disputes of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party has met its burden of showing entitlement to judgment as a matter of law, the burden then shifts to the non-moving party to provide facts establishing that a genuine issue for trial exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party cannot discharge its burden by cryptic, conclusory, or generalized responses but, instead, must produce some evidence showing a dispute of material fact. *See Tunnell v. Wiley*, 514 F.2d 971, 976 (3d Cir.1975); *see also Willetts v. Ford Motor Co.*, 583 F.2d 852, 856 (6th Cir.1978). A material fact is one that would change the outcome of the litigation. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Facts which are not outcome determinative are not material, and disputes over such facts will not preclude the court from granting summary judgment. *See id.*

Plaintiff alleges an unlawful taking of plaintiff's private property. The Federal Circuit has characterized the nature of "just compensation jurisprudence" as "fact intensive," warning against "precipitous grants of summary judgment." *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed.Cir. 1983). Accordingly, the court has carefully examined the briefs and affidavits and determined that there are genuine issues of material facts in dispute and that the Fifth Amendment takings analysis requires the full development of a factual record at trial.

## II. Fifth Amendment Takings Analysis

### A. Claim at Bar

■ Plaintiff brings this action premised on the Fifth Amendment to the United States Constitution, which states, in relevant part, that "private property [shall not] be taken for public use without just compensation." U.S. Const. amend. V. The Supreme Court has found that the Takings Clause of the Fifth Amendment requires compensation where a government regulation "goes too far" and it will be recognized as a taking. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). There is no conclusive formula to determine the point where a regulation ends and a constitutional taking begins. *See Goldblatt v. Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). Since the Court has eschewed the development of any set formula for determining a taking, it instead relies on ad hoc, factual inquiries into the circumstances of each particular case. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *see also Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

### 1. Basis for Taking

Plaintiff asserts that his just compensation must proceed because he possessed a reasonable investment-backed expectation of being able to conduct normal farming operations when he purchased the property. Plaintiff claims that when he purchased the property in 1975, it was after the passage of the Clean Water Act, but before the 1977 expansion of § 404 federal jurisdiction to his property. Mr. Brace also contends that his claim should survive summary judgment because the application of defendant's prohibition against dredging and filling deprived plaintiff of the economically viable use of the entirety of parcel B and therefore plaintiff is perpetually prevented from using thirty acres of his property.

### 2. Background of Clean Water Act

Since the parties premise their arguments on the Clean Water Act, 33 U.S.C. § 1251(a) (1976), and the CWA is a complicated statute, the court believes that a summary of this statute is appropriate.

The CWA is a statute designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33

U.S.C. § 1251(a) (1976).[6] In section 301(a) of the CWA, Congress proscribed the discharge of pollutants into "navigable waters" except in certain circumstances provided by the statute, such as by obtaining a permit issued by the Army Corps of Engineers (Corps) pursuant to section 404 of the CWA. 33 U.S.C. §§ 1311(a), 1344. Section 404 prohibits the "discharge of dredged or fill material into the navigable waters" without obtaining a permit from the Army Corps of Engineers. 33 U.S.C. § 1344. The CWA defines "navigable waters" as "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The legislative history of the Act demonstrates that although the definition is not self-explanatory, Congress intended that the phrase "navigable waters" be given the broadest possible constitutional interpretation. *See* S.Rep. No. 92–1236, at 144; *see also Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 914 (5th Cir. 1983). The Senate Committee on Public Works explained the need for a broad definition of "navigable waters" in order to control the discharge of pollutants at its source:

> The control strategy of the Act extends to navigable waters. The definition of this term means the navigable waters of the United States, portions thereof, tributaries thereof, and includes the territorial seas and the Great Lakes. Through a narrow interpretation of the definition of interstate waters the implementation [of the] 1965 Act was severely limited. Water moves in hydrologic cycles and it is essential that discharge of pollutants be controlled at the source. Therefore, reference to the control requirements must be made to the navigable waters, portions thereof, and their tributaries.

S.Rep. No. 92–414, at 77 (1972), 1972 U.S.C.C.A.N. at 3742; *see also Avoyelles Sportsmen's League,* 715 F.2d at 914.

Furthermore, the Conference Report states that "[t]he conferees fully intend that the term 'navigable waters' be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes." S. Conf. Rep. 92–1236, at 144, 1972 U.S.C.C.A.N. at 3822.

Originally the Corps adopted a narrow interpretation limiting its jurisdiction to navigable waters as that term had been previously defined under Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403 (1988). *See* 39 Fed.Reg. 12,115, 12,119 (1974). This definition excluded most wetlands that are generally non-navigable and other isolated or shallow waters from Section 404's jurisdiction. Conservation groups challenged these regulations, and the Corps was forced to expand its interpretation to recognize the full regulatory mandate of the CWA when the United States District Court for the District of Columbia invalidated the Corps' restrictive reading of the Act. *See Natural Resources Defense Council, Inc. v. Callaway,* 392 F.Supp. 685 (D.D.C.1975). The court in *Callaway* held that "Congress by defining the term 'navigable waters' [for purpose of the CWA], to mean 'the waters of the United States, including the territorial seas,' asserted federal jurisdiction over the nation's waters to the maximum extent permissible under the Commerce Clause of the Constitution." *Id.* at 686.

The Corps issued final interim regulations which redefined "the waters of the United States" and expanded the definition of navigable waters. *See* 40 Fed.Reg. 31,320 (July 25, 1975). The Corps interpreted the Act to cover all freshwater wetlands that are defined as areas that are "periodically inundated" and "normally characterized by the prevalence of vegetation that requires saturated soil conditions for growth and reproduction" as well as those that are adjacent to other covered waters. *See* 40 Fed.Reg. 31,324 (July 25, 1975); 33 C.F.R § 209.120(d)(2)(h) (1976).

In 1977, the Corps again refined its definition of wetlands. *See* 33 C.F.R. §§ 320–330.8 (1985). In the revised definition, the Corps eliminated the requirement of periodic inun-

---

6. The CWA was originally called the Federal Water Pollution Control Act. *See* S. Conf. Rep. No. 92–1236, at 99 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3668. In 1977, Congress approved the shortened title, "Clean Water Act." H. Conf. Rep. No. 95–830, at 1 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4326.

dation and no longer required that wetlands be adjacent to navigable water. The definition for wetlands in 1977 consisted of "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas." 33 C.F.R. § 323.2(c) (1978). In 1982, substantively identical regulations replaced the 1977 regulations, and these continue to be in place today. 33 C.F.R. § 323.2 (1985).

### B. Fifth Amendment Takings Criteria

■ In determining whether a regulatory taking has occurred, the Supreme Court has identified three factors that courts should examine. These factors include: (1) the character of the governmental action or regulation; (2) the economic impact of the regulation of the claimant; and (3) the extent to which the regulation has interfered with reasonable investment-backed expectations. *See Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *see also Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224–25, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

### 1. Character of governmental action or regulation

■ The first *Penn Central* factor, the character of the governmental action or regulation, examines challenged restraints under state nuisance laws. A governmental regulation is not deemed to be a taking if it prohibits what would or legally could be a nuisance. In analyzing this criteria, "courts must inquire into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented." *See Creppel v. United States*, 41 F.3d 627, 631 (Fed.Cir.1994).

In the case at bar, although the Cease and Desist Orders and the Consent Decree impact Mr. Brace's ability and his intention to use the land in his farming business, the government's actions do not amount to a regulatory taking, unless the regulatory action goes "too far." *See Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 800 (Fed.Cir. 1993); *see also Marks v. United States*, 34 Fed.Cl. 387, 408 (1995).

In partial regulatory takings cases, courts do not always examine the character of the government action. *See Broadwater Farms Joint Venture v. United States*, 45 Fed.Cl. 154, 156 (1999). In this case, neither plaintiff nor defendant explicitly assert this factor in their partial takings analysis. At times, the Supreme Court has not discussed the character of the government action in its partial takings analysis. See e.g., *Lucas*, 505 U.S. at 1019 n. 8, 112 S.Ct. 2886. The probable reason for its omission was that this factor typically propels inquiries as to whether the government's action is analogous to a physical invasion of its property, where compensation is more likely in such cases. *See Forest Properties, Inc. v. United States*, 39 Fed.Cl. 56, 67 (1997). Here, the Corps' regulations, Cease and Desist Orders, and Consent Decree do not involve the government effectuating a physical invasion of Mr. Brace's property but, rather, serve to proscribe plaintiff's use of the land.

Plaintiff argues that "he has been singled out to bear a public burden that others do not have to bear." *See* Plaintiff's Opposition to Defendant's Motion for Summary Judgment, at 8 (Filed: June 27, 2000). The court finds the government's actions to be neither arbitrary nor capricious, as wetlands serve important environmental functions. See e.g., *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131–35, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985).

Congress acknowledged the importance of protecting wetlands. Senator Muskie, one of the primary sponsors of the CWA, explained:

There has been considerable discussion of the provisions of section 404 of the act, much of which has been related to the suspicions and fears with respect to that section, and little of which has been related to substantive solutions to real problems while providing an adequate regulatory effort to assure some degree of wetlands

protection. There is no question that the systemic destruction of the Nation's wetlands is causing serious, permanent ecological damage. The wetlands and bays, estuaries and deltas are the Nation's most biologically active areas. They represent a principal source of food supply. They are the spawning grounds for much of the fish and shellfish which populate the oceans, and they are passages for numerous upland game fish. They also provide nesting areas for a myriad of species of birds and wildlife.

The unregulated destruction of these areas is a matter which needs to be corrected and which implementation of section 404 has attempted to achieve ... Without question, they should not and cannot be regulated by the Federal Government. Equally without question, there should be a degree of discipline over the extent to which these activities destroy wetlands or pollute navigable waters. The committee bill addresses these questions and tries to deal both with the institutional method for reducing the impacts of this program and also maintain a program of effective wetlands protection.

*See* 123 Cong. Rec. 26,697 (daily ed. Aug. 4, 1977) (statement of Sen. Muskie).

Clearly, Congress attempted to protect wetlands while dealing with the concerns of private individuals. The court will not further question the government's legitimate action in this case. The court holds that the United States has a legitimate public welfare obligation to preserve our nation's wetlands. The U.S. District Court for the Western District of Pennsylvania, in its Adjudication of Findings of Fact explained that wetlands constitute a productive and valuable resource and the unnecessary destruction of wetlands causes serious violations of environmental laws and must be discouraged as contrary to public policy. *See Brace,* No. 90–229, at ¶ 5. Wetlands fulfill vital functions important to the environment and public interest, such as (1) serving water purification and water quality enhancement functions; (2) serving as storage areas for storm and flood waters; (3) serving natural biologic functions, such as food chain production, general habitat, and

resting sites for aquatic or land species; and (4) serving erosion and sedimentation control functions. *See* 33 C.F.R. § 320.4(b); 40 C.F.R. § 230.41. The Government's actions in this case were implemented to protect plaintiff's wetlands.

## 2. Economic Impact of the Regulation

The second *Penn Central* factor, examines the economic impact of the regulation on the property owner. In this case, it entails an inquiry into the economic impact of the Cease and Desist Orders and Consent Decree. If the effect of the government's enforcement of Section 404 of the CWA was to deny plaintiff all economically viable use of its property, plaintiff would be entitled to compensation. *See Tabb Lakes v. United States,* 26 Cl.Ct. 1334, 1345 (1992) (stating that if the effect of the Cease and Desist Order was to deny plaintiff all economically viable use of its property, it would be entitled to compensation notwithstanding inquiry into the other two factors outlined in *Penn Central* ).

Before the court can determine whether the regulation had the effect of taking all economically viable use of the property, the property needs to be defined. Since the test for regulatory taking requires the court "to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction.'" *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987)

In determining whether a governmental action has constituted a taking, the court must focus "both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole." *Penn Central Transp. Co.,* 438 U.S. at 130–31, 98 S.Ct. 2646; *see also Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184, 1192 (1981); *Ciampitti v. United States,* 22 Cl.Ct. 310, 318 (1991). "'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." *Penn Cen-*

*tral Transp. Co.*, 438 U.S. at 130, 98 S.Ct. 2646. "[W]here an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus v. Allard*, 444 U.S. 51, 65–66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979).

The court, in *Ciampitti*, noted that, "[i]n the case of a landowner who owns both wetlands and adjacent uplands, it would clearly be unrealistic to focus exclusively on the wetlands, and ignore whatever rights might remain in the uplands." *Ciampitti*, 22 Cl.Ct. at 318. Furthermore, the court identified factors that enter into the 'calculus' such as "the degree of continuity, the dates of acquisition, the extent to which the parcel has been treated as a single unit, the extent to which the protected lands enhance the value of the remaining lands . . ." *See id.*

Plaintiff purchased two parcels of land from his father in December 1975 (Waterford Township parcel); parcel A which consisted of approximately 60 acres, and parcel B, which consisted of approximately 80 acres. These two parcels are contiguous and divided by a road. Plaintiff acquired an additional 135 acre parcel in May 1983, which is contiguous to parcels A and B (the Waterford Township property). Plaintiff's alleged intentions was to use these parcels together in his farming operation.

The case at bar is distinguishable from the facts in *Ciampitti*. In *Ciampitti*, plaintiff purchased approximately 45 acres of land, consisting of lots, 14 of which were wetlands, in one of a series of purchases, known as purchase 7. 22 Cl.Ct., at 312–13. Plaintiff contended that the parcel as a whole consisted only of those lots for which a federal permit was sought, hence compromising only the 14 acres of wetlands. *See id.* at 319. The court in *Ciampitti* determined that from Ciampitti's standpoint when he purchased the land, the purchase of the 45 acres of land was viewed as a single parcel. Even if he believed he could develop the wetlands differently, Ciampitti was forced to purchase and mortgage the land as a package. *See id.* Ciampitti treated purchase 7 as a single parcel for purposes of purchasing and financing. In the case at bar, plaintiff is not arguing that the wetlands solely consist of the parcel as a whole. Mr. Brace, rather, contends that parcel B is the relevant parcel at issue, unlike the argument Ciampitti set forth.

■ In evaluating the economic impact of a regulation in a takings case, the court must "compare the value that has been taken from the property with the value that remains in the property." *Keystone*, 480 U.S. at 497, 107 S.Ct. 1232. Defendant argues that plaintiff cannot divide his land into segments to establish that all economically viable use of his property has been taken. Defendant argues that the thirty acres of wetlands is merely a small part of the overall 600 acre farming operation, and that the 600 acres constitute the relevant parcel under the *Penn Central* test. Plaintiff contends that parcel B is the relevant parcel and that defendant's references to 600 acres are not based on findings of fact. Plaintiff argues that the original enforcement action in the District Court for the Western District of Pennsylvania was brought against plaintiff and a corporation in which plaintiff had an interest. Mr. Brace argues that a substantial and increasing portion of its property is unusable for any economically viable purpose by plaintiff, and Mr. Brace asserted that he has been prevented from using "at least thirty acres" of his property for "any economically viable use" from July 15, 1987 to the present. See *Complaint*, at para. 18 (Filed: Nov. 28, 1998). As the number of acres plaintiff owns is in dispute, the court cannot determine the economic impact of the taking on the plaintiff's land. If plaintiff is deemed to own 600 acres of land, as defendant argues, then the taking of thirty acres of wetland property would constitute a mere 5% of his total property. Since the ownership of the 600 acres is in dispute, and constitutes a material fact, the court cannot determine the economic impact of the regulation.

Plaintiff argues that the analysis in *Florida Rock Industries, Inc. v. United States*, 18 F.3d 1560 (Fed.Cir.1994), should be the framework used in examining his claim. The court, in *Florida Rock*, recognized a distinction between cases which involve a noncompensable "mere diminution" and a "compensable 'partial taking.'" *Florida Rock Indus.*,

18 F.3d at 1570. " 'Mere diminution' occurs when the property owner has received the benefits of a challenged regulation, such that an 'average reciprocity of advantage' results from it." *Creppel,* 41 F.3d at 631 (citing *Lucas,* 505 U.S. at 1016–18, 112 S.Ct. 2886). "A 'partial taking' occurs when a regulation singles out a few property owners to bear burdens, while benefits are spread widely across the community." *Id.* (citing *Florida Rock,* 18 F.3d at 1571). A partial taking is where a regulation results in a deprivation "of a substantial part but not essentially all of the economic use or value of the property." *Florida Rock,* 18 F.3d at 1568. The court in *Florida Rock* held that there was a compensable partial taking of property where plaintiff was denied a dredge and fill permit to mine limestone on his wetland property. *Florida Rock Indus., Inc. v. United States,* 45 Fed.Cl. 21 (1999), *remanded from Florida Rock Indus., Inc. v. United States,* 18 F.3d 1560 (Fed.Cir.1994). The court found that the permit denial caused a "severe, but not total, loss of the economically viable use" of the plaintiff's property effecting a compensable partial regulatory taking of the property. *Florida Rock,* 45 Fed. Cl. at 23.

Plaintiff argues that an application of the analyses employed in *Florida Rock* demonstrates that there was a partial regulatory taking, asserting that the government's actions amounted to a severe economic impact on plaintiff's property, and albeit not a total loss, it resulted in a partial taking. The court in *Florida Rock* applied the *same Penn Central* three factor test, to determine if a partial regulatory taking occurred. With regard to the reasonable investment-backed expectations, the *Florida Rock* court explained that Florida Rock purchased the property, obtained state and local permits, conducted a feasibility study which indicated plaintiff could proceed with its mining plan, and commenced mining, all prior to the extension of the Corp's jurisdiction to plaintiff's property in 1977. *See id.* at 39. The court determined that plaintiff's reasonable investment-backed expectations were frustrated as the CWA was not enacted until after Florida Rock purchased the property. *See id.* at 39–40. It noted "[w]here a federal statute was already in place at the time the property was bought, the expectations of the property owner may be different." *Id.* at 29.

*Florida Rock* is distinguishable from the instant case because the CWA was enacted prior to the time Mr. Brace purchased the property, while plaintiff in *Florida Rock,* purchased his property in 1972 prior to the enactment of the CWA. Additionally there were no federal laws similar to the CWA in place at the time plaintiff in *Florida Rock* purchased his land. *See id.* at 28. Furthermore, the court in *Florida Rock* also noted that limestone underlaid the entire parcel, and, therefore, 100 percent of the primary use of the parcel was affected, causing a sizeable interference with reasonable investment-backed expectations. *See id.* at 39.

■ Defendant argues that plaintiff's remaining land uses are plentiful and that, although there has been an interference with thirty acres of plaintiff's land, there are remaining valuable economic rights in the property as a whole. The court cannot make that determination without additional evidence on the value of the land. Neither party presented any appraisal reports and there is no evidence that the wetland acres are proportionally more valuable than the remainder of plaintiff's property. "[M]ere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 645, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993). Although the Supreme Court has rejected the idea that mere diminution in property value, standing alone, is sufficient to establish a taking, this court cannot make such a determination without knowing the amount of land plaintiff owns. *See Penn Central Transp. Co.,* 438 U.S. at 131, 98 S.Ct. 2646.

■ The court cannot support defendant's reliance on the Third Circuit's finding that the plaintiff is the owner of 600 acres of real property, without knowing the extent of plaintiff's complete interest in the land. The court cannot hold an interference with the 30 acre wetland site does not prevent all or substantially all of the economically viable

use of plaintiff's property. Therefore, the court cannot determine the economic impact of the government's enforcement of the CWA. Hence, the plaintiff must be allowed to go forward with its complaint, as there is a material fact in dispute, so the court can make a factual determination of the land interest which is economically impacted by the regulations.

### C. Reasonable Investment–Backed Expectations

■ The third factor of the *Penn Central* takings analysis is the extent to which the government action interferes with the property owner's reasonable investment-backed expectations. *See Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646. This criterion limits recovery to property owners who can demonstrate that they purchased their property in reliance on the nonexistence of the challenged regulation. *See Creppel,* 41 F.3d at 632. *See e.g., Connolly,* 475 U.S. at 226–27, 106 S.Ct. 1018 (holding that there is no reasonable expectation in light of Congress' legislation in the pension field); *Ruckelshaus v. Monsanto,* 467 U.S. 986, 1006–11, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (finding that there was no reasonable expectation that the EPA would keep information confidential considering the regulatory scheme); *Ciampitti v. United States,* 22 Cl.Ct. 310, 321–22 (1991) (holding that there was no reasonable investment-backed expectations that an owner could develop wetlands in light of the section 404 permit system of the CWA). One who purchases property with knowledge of a restraint assumes the risk of economic loss. *See Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1177 (Fed.Cir.1994).

■ Furthermore, these expectations must be "reasonable." *See Ruckelshaus,* 467 U.S. at 1006, 104 S.Ct. 2862; *see also Ciampitti,* 22 Cl.Ct. at 318. A "mere unilateral expectation or an abstract need" will not suffice for a reasonable investment-backed expectation. *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct.

446, 66 L.Ed.2d 358 (1980); *see also Ruckelshaus,* 467 U.S. at 1005, 104 S.Ct. 2862.

Plaintiff contends that when he purchased the Murphy Farm, he was not aware that the CWA applied to his property because the statute's jurisdiction had not been extended until 1977.[7] The regulations in 1977 broadened the Corps jurisdictional rules and expanded the definition of wetlands, which now included plaintiff's property. Mr. Brace further argues that at the time he purchased the property in 1975, federal law did not require that a permit be obtained from the Corps in order to dredge or fill wetlands of the character plaintiff possessed. Based on the legislative history of the CWA, discussed above in part II, A. 2, it is clear that Congress intended the term "navigable waters" to be given a broad constitutional interpretation. *See* S.Rep. No. 92–1236, at 99; *see also Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 914 (5th Cir.1983); *Leslie Salt Co. v. Froehlke,* 578 F.2d 742, 754–55 (9th Cir.1978) (holding that "navigable waters" within the meaning of the CWA is to be given the "broadest possible interpretation under the Commerce Clause"). Although there is no direct precedent indicating the passage of the CWA serves to inform a party's reasonable expectations, the United States Court of Appeals for the Federal Circuit, in dealing with the Termination Act enacted in 1962, has held:

[t]he difficulty with the Tribe's argument, creative though it is, is that it is contrary to one of the fundamental premises of our legal system. The argument assumes that the adverse effect of the 1962 Act did not become operative against the Tribe—the Tribe was not "damaged"—until the Supreme Court some 25 years later so construed the Act. While the Supreme Court's pronouncement in 1986 might be relevant to fixing the time when the Tribe *subjectively* first knew what the Act meant, *it is fundamental jurisprudence that the Act's objective meaning and effect where fixed when the Act was adopted.* Any later

**7.** Plaintiff additionally argued that section 404 contained an agricultural exemption for normal farming activities, however this court will not address the issue of the agricultural exemption

because the Third Circuit held in *United States v. Brace,* that plaintiff's dredging and filling activities did not fall within this exemption. *Brace,* 41 F.3d at 129.

judicial pronouncements simply explain, but no not create, the operative effect. *Catawba Indian Tribe of S. Carolina v. United States,* 982 F.2d 1564, 1570 (Fed.Cir. 1993) (emphasis added).

This court has held that "[w]here a regulatory scheme is in place at the time of purchase, as was the Clean Water Act here, the reasonableness of the buyer's expectations must be discounted." *Broadwater Farms,* 45 Fed.Cl. at 156. In *Broadwater,* this court held that plaintiff had actual knowledge of the CWA and it was "not reasonable for a sophisticated developer with actual knowledge of both a regulatory scheme and the possible existence of non-tidal wetlands, to expect unencumbered development" of his property. *Id.* at 156. In that case, plaintiff purchased the property in 1987, and had actual and constructive knowledge of the CWA when it purchased its property. Although Mr. Brace purchased his property in 1975, before the 1977 amendments were enacted, plaintiff had notice due to the passage of the CWA as well as by judicial decisions in 1974, and 1975, which expounded on the proper scope of "waters of the United States" regulated under the CWA. The term "waters of the United States" had in several cases been judicially construed to reach all waters that may be regulated under the Commerce Clause. *See e.g., Callaway,* 392 F.Supp. at 686; *Sun Enterprises, Ltd. v. Train,* 394 F.Supp. 211, 223 (S.D.N.Y.1975); *United States v. Ashland Oil & Transp. Co.,* 364 F.Supp. 349, 351 (W.D.Ky.1973), *aff'd,* 504 F.2d 1317, 1323–25 (6th Cir.1974). Therefore, plaintiff was on notice by the passage of the CWA as well as by judicial decisions which explained the scope of "waters of the United States" regulated under the CWA.

■ A purchaser's reasonable investment-backed expectations are informed not solely "by whether the specific regulatory restrictions at issue were in place at the time of purchase, but also by the regulatory climate at the time, and whether plaintiff's investment in purchase and development can be considered objectively reasonable in light of that climate." *Good v. United States,* 39 Fed.Cl. 81, 109 (1997). In *Good,* plaintiff argued that at the time he purchased the property, the Endangered Species Act had not yet been enacted, and the Army Corps of Engineers had not yet asserted jurisdiction over wetlands under the CWA. *See id.* at 108–09. The court held at the time plaintiff chose to invest in development, the specific restrictions at issue were in place. *See id.* at 109. The court further held that due to the pervasiveness of the federal and state regulatory regimes limiting the development of the coastal wetlands at the time the developer purchased the property and made major investment in the development, he lacked a reasonable investment-backed expectation. *See id.* at 110–13.

■ Mr. Brace argues that *Good* is distinguishable from the case at bar because "when [Brace] purchased the Murphy Farm, [he] simply was not aware and could not have been aware that the federal jurisdiction and authority extended to his property and farming activities because jurisdiction had not been extended until July 1, 1977." *See* Plaintiff's Opposition to Defendant's Motion for Summary Judgment, at 7 (Filed: June 27, 2000). Mr. Brace, however, recognized the regulatory regime and admitted, that he was "generally aware of the existence of the Clean Water Act in 1975, and that, in general terms, it regulated discharges of pollutants into rivers, streams, and water bodies." *See* Affidavit of Robert H. Brace, Exhibit 1 to Plaintiff's Opposition to Defendant's Motion for Summary Judgment, at 2 (Filed: June 27, 2000).

Defendant argues that by failing to promptly apply for a section 404 permit, plaintiff undertook the risk that environmental requirements would become more stringent. *See* Reply Memorandum in Support of Defendant's Motion for Summary Judgment, at 10–12 (Filed: September 11, 2000). Between 1975, and 1987, when plaintiff was discovered draining the wetlands and growing crops on the property, environmental regulations became more pervasive. The *Deltona* court found that a denial of a permit based on the regulations subsequent to the purchase of the land was not found to be sufficient to justify a taking. *See Deltona v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184,

1193 (1981). *Deltona* involved a takings claim brought by a developer prohibited from completing a multi-phase development intended to be built upon property that was to be dredged and filled out of wetlands. The court held that at the time plaintiff purchased the property in 1964, plaintiff knew that its development was contingent upon obtaining the necessary permits. *See id.* at 1187–88. The court found standards governing the issuance of permits could change and that a taking was not established merely "by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development." *See id.* at 1193 (*quoting Penn Central Transp. Co. v. New York*, 438 U.S. at 130, 98 S.Ct. 2646). The court acknowledged that the implementing regulations adopted by the Corps of Engineers pursuant to its statutory authority have become more complex and that the purpose of the revisions of the Corps' regulations in 1977 were "to simplify and reorganize the existing body of rules to make them more understandable." *See id.* at 1188.

When plaintiff acquired the property in 1975, he knew of the wetland character of the property. The 1961 Soil Conservation Survey for Erie County prepared by the U.S. Department of Agriculture identifies the site as wetlands. *See* Defendant's Motion for Summary Judgment, at Exhibit C (Filed: May 12, 2000). Plaintiff was aware of, and utilized the soil and conservation plans that were prepared for his father. *See United States v. Brace*, 41 F.3d at 120. Furthermore, in the district court action, Mr. Brace stipulated that at the time of the discharges, the character of the property was wetlands. *See Brace*, No. 90–229, at ¶ 4. Therefore, plaintiff, knowing the wetland character of the land, by failing to promptly apply for a section 404 permit, knowingly took a risk that environmental regulations would become more stringent.

## CONCLUSION

In this action, plaintiff contends that the Government, by issuing Cease and Desist Orders which ordered plaintiff to cease operation of the drainage system on his property and restore portions of his property to a prior condition exhibiting wetlands characteristics, took his property without compensation, in violation of the Fifth Amendment. Under the regulatory/partial takings analysis, plaintiff is unable to demonstrate that there was an insufficiency in the character of the Government's actions, nor is the plaintiff able to demonstrate that he had reasonable investment-backed expectations in the development of the Murphy Farm land. The second part of the *Penn Central* test, however, cannot be determined. The economic impact of the Cease and Desist Orders and Consent Decree cannot be evaluated as there is a material fact in dispute. The court cannot find that there is substantial economic value remaining in the parcel as a whole, whereby the Government's actions would cause a mere diminution in the value of the property which is noncompensable. The second factor of the *Penn Central* test requires a development of factual record at trial or additional discovery. As there is a material fact in dispute, defendant is not entitled to judgment as a matter of law.

For the foregoing reasons, the court finds that there is a genuine issue of a material fact in dispute. Therefore, Defendant's Motion for Summary Judgment is hereby DENIED. The parties are hereby ordered to file a joint status report, notifying the court how the parties would like to proceed, on or by January 12, 2001.

**IT IS SO ORDERED.**